## ALLEN *v.* CITY OF ATLANTA.

1. When a municipality desires to incur any bonded indebtedness under the present constitution of this State, the officers charged with levying taxes and contracting debts for the municipality shall publish notice, for the space of thirty days next preceding the date of the election, in the newspaper in which the sheriff's advertisements for the county are published, notifying the qualified voters that on the day named an election will be held to determine the question whether bonds shall be issued by the municipality; and in such notice they shall specify what amount of bonds are to be issued, for what purpose, what interest they are to bear, how much principal and interest to be paid annually, and when to be fully paid off. If such notice be given under an ordinance, the latter must contain the above terms and particulars; and if the ordinance and notice fail to prescribe any of said terms, both the ordinance and notice are void.

2. When in pursuance of an ordinance and notice published thereunder the qualified voters of the municipality vote for an issue of bonds for a specific purpose or purposes, the mayor and council of such municipality can not divert the proceeds of such bonds to any other purpose or purposes.

3. Where an ordinance provided for the submission to the qualified voters of the City of Atlanta of a proposal for an issue of bonds of $8,000,000 for specified purposes, including an issue of "$1,000,000 of bonds for a city hall and site therefor;" and where said ordinance further provided that, if said bonds were authorized for such purpose, "the proceeds thereof should be applied exclusively for a city hall and site therefor;" and where it contained a provision that voters favoring the issue of such bonds for the city hall should have written or printed on their ballots the words, "For the issue of $1,000,000 of bonds for a city hall and site therefor," and that voters opposing the issue of such bonds should have written or printed on their ballots the words, "Against the issue of $1,000,000 of bonds for a city hall and site therefor;" and where the published notice of the election contained the first and last provisions above referred to, the question of the selection of a site for the city hall was not submitted to the voters of the city for their determination, and the mayor and general council of the city were not precluded, by a vote in favor of such bond issue for a city hall, from selecting the site for the city hall.

4. Where contemporaneously with the passage of such ordinance, and before publishing in pursuance thereof the notice to the qualified voters of the election, the mayor and general council passed a resolution reciting that "a bond election has been called, and at said election it is proposed to vote upon the question of bonds for a city hall, and it is desired to let the peple know at which place new city hall will be built, if bonds therefor are voted," and declaring that the .mayor and general council of the city thereby "select, as a site for the new city hall, if voted, the location east of the present court-house," and further declar-

Municipal Corporations, 44 C. J. p. 1197, n. 16; p. 1199, n. 67, 69, 76; p. 1200, n. 80, 92; p. 1203, n. 33, 35; p. 1219, n. 98.

ing that the mayor and general council "agree, if said bonds are voted, to build the new city hall on said described land," such resolution did not have the effect of submitting to the voters the question of the approval or rejection of the site so selected by the mayor and general council. At most such resolution informed the voters, for their guidance in voting, of the then decision of the mayor and general council as to the location of the new city hall; but it did not preclude the mayor and general council from changing their determination in this matter and erecting the city hall on another site, when it became impracticable, from the proceeds of the bonds voted, to acquire the site on the court-house lot with the necessary adjacent land, and to erect thereon the new city hall.

### No. 6280. FEBRUARY 15, 1928.

Petition for injunction. Before Judge Humphries. Fulton superior court. September 16, 1927.

The mayor and general council of the City of Atlanta passed an ordinance calling for an election to be held on September 23, 1925, upon the question of issuing bonds for the erection of a new city hall. The county commissioners of Fulton County passed a resolution offering to sell to the city a portion of the land owned by the county and embraced in the block upon which the county court-house is located, at cost price plus interest at the rate of seven per cent. per annum, the value of the land to be arrived at on a prorate basis by a committee composed of a member of the board of county commissioners, a member of the city council, and a member of the real-estate board satisfactory to each, the county to retain a sufficient portion of the land then owned by it, or which might be purchased by the city, for the construction of a county jail or other county purposes in co-operation with the city, but to be owned and operated by the county. This offer to sell the city was made "on condition that the citizens of Atlanta vote bonds for the construction of a city hall on the site" described in this resolution. By a resolution of the city council adopted on August 17, 1925, and approved October (September?) 18, 1925, the city accepted said offer of the county commissioners, ".conditioned only upon the citizens of Atlanta voting bonds for the construction of the city hall on said site." At the election held on September 23, 1925, the proposal to issue said bonds was defeated. Thereafter the mayor and general council of the city formulated an extensive plan of municipal improvements, including the building of a new city hall, the construction of viaducts on Pryor street and on Central Avenue, the erection of new school buildings, in-

cluding equipment, extensions, and improvements of its water-works system, extensions, additions, and improvements in its system of sewers, and for survey and map of the present and future needs of the city for sewers and sewer disposal. In pursuance of said plan an ordinance was passed calling for an election to be held on March 24, 1926, upon the issuing of bonds as follows: $3,500,000 for school buildings and equipment; $500,000 for extension and improvement of the system of waterworks; $2,000,000 for extensions, additions and improvements in the system of sewers and for a survey and map of the present and future needs of the city for sewers and sewer disposal; $1,000,000 for city hall and site therefor; $1,000,000 for the construction of viaducts on Pryor Street and Central Avenue over the railroads, and approaches thereto, cross-sections, and consequent expenses. Said ordinance further provided that if the bonds were authorized for the city hall and site, "the proceeds thereof should be applied exclusively for the city hall and site therefor," that the voters at said election favoring the issuing of bonds for the city hall should have written or printed on their ballots the words, "For the issue of $1,000,000 of bonds for a city hall and site therefor," and that those opposing said issue of bonds should have written or printed on their ballots the words, "Against the issue of $1,000,000 of bonds for a city hall and site therefor."

On February 15, 1926, a resolution was adopted by the council and approved by the mayor of the city, as follows: "Whereas a bond election has been called, and at said election it is proposed to vote upon the question of bonds for a city hall, and it is desired to let the people know at which place new city hall will be built, if bonds therefor are voted: Therefore be it resolved by the Mayor and General Council of the City of Atlanta that we hereby select, as a site for the new city hall, if voted, the location east of the present court-house, bounded by East Hunter Street, Central Avenue, the court-house and property to south of south line of the court-house property, if extended. That we agree, if said bonds are voted, to build the new city hall on said described land." This resolution was published in the city papers. Members of the city council and other citizens who advocated said bond issues assured the taxpayers of the city and county, in the newspapers and by speeches made in all parts of the city, that the new city

hall would be erected on the same block upon which the county court-house was located, and urged upon the voters the great advantages of having the county and city buildings adjacent to each other, particularly in view of the proposed new viaducts, one of which would be constructed immediately to the west side of the block and the other to the east side of the block upon which the court-house was located; that such location would enable the taxpayers in one trip to pay both city and county taxes, and would simplify the examination of titles to real estate; that the proposed city hall would be within one block of the original geographical center of the city, that the police and fire headquarters and city and county jails would be thus centrally located in one building, all of which would be especially advantageous in view of the future growth of the city. On February 16, 1926, there appeared in the three Atlanta newspapers articles in large type, beginning on the front pages thereof, in which it was stated that the city council had approved the above bond issues and the location of the proposed new city hall on the county court-house site. The election held on March 24, 1926, resulted in favor of the issuing of bonds for all of the purposes above stated. The city council now proposes to build a city hall, not on the court-house site, but at the corner of Washington and Mitchell streets.

Allen filed his suit to enjoin the erection of the city hall at the latter site chosen by the city council. On the hearing of the application for injunction, besides the facts hereinbefore stated, it appeared that after the approval of these bond issues the city entered into negotiations with the county commissioners for the purchase of a portion of the block in which the county court-house is located, for the site of the city hall. The city council was anxious to erect the city hall adjacent to the county court-house, in view of the resolution of the city council of February 15, 1926. After negotiations between the city and the county commissioners, the commissioners fixed a price of $368,000 for the purchase of the site east of the court-house for the city hall, and could not be induced to accept any less sum for the property. It was further necessary for the city to secure more land than the county had. The adjoining land for this purpose would cost the city $275,000. Besides, to build the city hall on the property of the county would require piling, at a cost of $50,000. After expending these sums

from the proceeds of the bond issue for the city hall and site, the city would be without sufficient funds with which to erect the new city hall. The city owned property at the corner of Washington and Mitchell streets, which, with the purchase of another piece which the city could purchase for $53,000, would furnish ample ground for the erection of the new city hall. For these reasons the city council decided to erect the new city hall at the corner of Washington and Mitchell streets. This location is near the county court-house. Petitioner introduced affidavits tending to show that various voters voted for the bond issue for the city hall under the impression that it would be located on the site just east of the court-house and on the county property.

The trial judge declined to grant a temporary injunction. To this judgment petitioner excepted and assigned error thereon because it was contrary to law; because the qualified voters of Atlanta authorized the issuing of bonds for the erection of a new city hall on the site adjacent to the court-house, which fact bound the city to erect it there; because the city was without authority to erect it elsewhere; because the diversion of said funds would constitute on the part of the city a breach of trust with the voters; and because, having represented by solemn ordinance to the voters that the new city hall would be erected on the site immediately east of the county court-house, with the advantages attending such location, the city procured votes for such city hall, and the selection of a wholly different and less accessible and convenient site was a breach of faith with its voters who must bear the burden of paying the bonds issued for such new city hall.

*H. A. Etheridge* and *J. K. Jordan,* for plaintiff.

*J. L. Mayson* and *C. S. Winn,* for defendant.

HINES, J. (After stating the foregoing facts.) 1. When any municipality shall desire to incur any bonded indebtedness under the present constitution of this State, the officers charged with levying taxes and contracting debts for the municipality shall publish notice for the space of thirty days next preceding the date of the election, in the newspaper in which the sheriff's advertisements for the county are published, notifying the qualified voters that on the day named an election will be held to determine the question whether bonds shall be issued by the municipality; and in such notice they shall specify what amount of bonds are to be

issued, for what purpose, what interest they are to bear, how much principal and interest to be paid annually, and when to be fully paid off. Civil Code, § 440. This statute has properly received from this court a strict construction. If such notice be given under an ordinance, the latter must contain the above terms and particulars, and if the ordinance and notice fail to prescribe any of said terms, both the ordinance and notice are void and of no effect. *Bowen* v. *Greensboro,* 79 *Ga.* 709 (3) (4 S. E. 159) ; *Mayor &c. of Athens* v. *Hemerick,* 89 *Ga.* 674 (16 S. E. 72) ; *Ponder* v. *Forsyth,* 96 *Ga.* 572 (23 S. E. 498) ; *Wilkins* v. *Waynesboro,* 116 *Ga.* 359 (42 S. E. 767) ; *Berrien County* v. *Paulk,* 150 *Ga.* 829, 832 (105 S. E. 491). So under the above statute the ordinance calling an election to determine whether municipal bonds shall be issued, and the published notice under such ordinance calling such election, shall specify the purpose or purposes for which the bonds are to be issued.

2.   When in pursuance of such ordinance and notice the qualified voters of the municipality vote for an issue of bonds for a specific purpose or purposes, we are clear that the mayor and council of such municipality can not divert the proceeds of such bonds to any other purpose or purposes. They hold such funds in trust for the purpose or purposes for which the bonds were voted. Any diversion of such funds from the purpose or purposes for which they were voted would be a misapplication of such funds, and a breach of the trust imposed in them by the voters. *Dubberly* v. *Morris,* 163 *Ga.* 144, 146 (135 S. E. 718) ; *Marks* v. *Richmond County,* 165 *Ga.* 316 (140 S. E. 880). If the question of the issuing of these bonds for the erection of the new city hall on the lot east of the county court-house had been submitted to the voters, and the selection of the court-house lot had been approved by the voters as the site of the new city hall, then the city could not divert the proceeds of the bonds to the erection of a new city hall on a different site. The erection of the city hall upon the court-house lot and the issuing of the bonds might have been submitted to the voters together; but the better practice is to submit these matters separately. *Cain* v. *Smith,* 117 *Ga.* 902 (3) (44 S. E. 5). So if the selection of the county lot as the site of the new city hall had been left to the voters, and they had selected the county lot as the site therefor, their vote in favor of that site

3

would probably bind the city. In any event, if the voters had authorized the city to issue these bonds, provided their proceeds were used in erecting a new city hall on the county court-house lot, then the bonds could not be issued or their proceeds used for the erection of a new city hall upon any other site. While one city council can not bind another city council in matters of municipal· legislation, the voters, who are the masters, can, in a matter of this kind, bind the mayor and general council, who are the mere servants of the voters.

3, 4. This brings us to consider the controlling question involved in this case; and that is, whether the selection of the site of the new city hall was submitted to the qualified voters of the city, whether they selected the court-house lot as the site of the new city hall, and whether their approval of the bond issue was based upon the condition that the new city hall should be erected upon the county court-house lot. We do not think that the selection of the site of the new city hall was submitted to the voters of the city, even if such matter could properly have been submitted to their determination. The voters did not authorize the issuing of these bonds upon the condition that their proceeds could only be used in the erection of a new city hall upon that lot. There were two elections in the City of Atlanta upon the question of issuing bonds for the erection of a new city hall. One was held on September 23, 1925. Prior to that election, in which the issuance of $2,000,000 of bonds for a city hall was submitted to the voters, the county commissioners had passed a resolution offering to sell to the city, upon certain terms, a portion of the lot upon which the county court-house is located, for the erection of a new city hall; but this offer was expressly made upon condition that the qualified voters of the city approved the bond issue for the erection of the new city hall. The city, upon the same terms, accepted the offer. Thereafter the voters voted down the proposition of issuing bonds for the new city hall. This relieved the county of its offer and the city from its acceptance. Thereafter the city proposed to the voters a bond issue of $8,000,000. This plan involved, among other things, an issue of bonds amounting to $1,-000,000 for a new city hall and site. The ordinance submitting to the voters the issuance of bonds amounting to $8,000,000 contained the proposal of an issue of "$1,000,000 of bonds for a city

hall and site therefor." This ordinance further provided, that, if said bonds were authorized for the city hall and site, "the proceeds thereof should be applied exclusively for a city hall and site therefor." It further provided that the voters in said election favoring the issuing of bonds for the city hall should have written or printed on their ballots the words, "For the issue of $1,000,000 of bonds for a city hall and site therefor;" and that those opposing such issue of bonds should have written or printed on their ballots the words, "Against the issue of $1,000,000 of bonds for a city hall and site therefor." The published notice of the election contained the above provisions. So under this ordinance and the published notice of the election the only question submitted to the voters, so far as the city hall was concerned, was whether they would approve or disapprove an issue of bonds of $1,000,000 "for a city hall and site therefor." The question of the selection of a site for the new city hall was not submitted to the voters. They were not called upon to approve or disapprove the selection of the east portion of the lot upon which the county court-house is located, as the site for the new city hall. At the ensuing election the voters voted for an issue of $1,000,000 of bonds "for a city hall and site therefor." They did not vote for any particular site. They did not select the east side or any other portion of the lot upon which the county court-house is located, as the site for the new structure. They left to the city council the plan and character of a new city hall and the selection of a site upon which it was to be erected. No one can read the ordinance providing for this election and the published notice thereof, standing by themselves, and reach the conclusion that the selection of the site was in any way left to the voters of the city. But it is insisted that on February 15, 1926, the mayor and general council passed a resolution which recites that "it is desired to let the people know at which place new city hall will be built, if bonds therefor are voted," and that the mayor and general council of the city thereby "select, as a site for the new city hall, if voted, the location east of the present court-house," and that they "agree, if said bonds are voted, to build the new city hall on said described land." It is insisted that the ordinance calling the election, and the published notice thereof, should be construed in the light of this resolution; and that, so construing them, the selection of the site designated in the reso-

lution was in effect left to and approved by the voters of the city. While this view is plausible, and while at first blush we were impressed with it, we have reached the conclusion that the bonds for the erection of a new city hall were not voted upon the condition that their proceeds should be used in erecting the structure upon the lot described in the resolution, and not elsewhere in the City of Atlanta. At most the resolution means that the voters should know, before voting, that the mayor and council had selected the site on the county court-house lot, and that they agreed, if bonds were voted, to erect this building on that location. The selection of a site was in no way left to the city voters. The resolution must be construed in the light of the situation as it existed at the time of its passage. At that time the city had not acquired from the county the east portion of the court-house lot for the erection of the new city hall. It had no binding contract with the county for its acquisition. Whether the selection and the agreement of the mayor and general council could be carried out depended upon their ability to acquire from the county a portion of the court-house lot and the necessary additional property for the erection of a new city hall at a price which would enable the city to pay for the site and have funds sufficient left for the erection of this structure. By their selection and agreement the city council were not bound, if. it should turn out afterwards that their selection and agreement became incapable of being carried out. The voters are presumed to have understood that the selection of the court-house site and the agreement of the mayor and council to build thereon were necessarily dependent upon the financial ability of the city to acquire the site and to build the new city hall thereon with the proceeds of the bonds voted for that purpose. So while the mayor and general council had selected the county court-house site and had then determined to build thereon, the sole question left to the voters was whether they would approve generally a $1,000,000 bond issue for a new city hall and a site therefor; and in approving such bond issue the voters did not attempt to tie hard and fast the hands of the city council, so that they could not select another site and build thereon the new city hall, if its erection on the site designated in this resolution could not be used in the erection thereon of the new city hall.

It is proper to say that the mayor and general council seem to

have made a fair and honest effort to acquire a portion of the county court-house lot and other necessary real estate for the purpose of erecting, adjoining the county court-house, the new city hall, so as to carry out the resolution of February 15, 1926, and to secure to the people of the city the supposed advantages of having the new city hall erected by the side of the court-house; and that their failure in this matter was due to their inability to acquire the court-house site at such figures as would enable them to erect a new city hall on that location. It would be stretching this resolution too far to hold that in no event could the mayor and general council erect this building upon any other site. So we are of the opinion that the voters of the city did not approve this bond issue upon the condition that the city hall should be built upon the court-house site in all events, and that the entire enterprise should be abandoned if it became impossible to erect the same thereon. Having voted generally for a bond issue for the erection of a new city hall and for the acquisition of a new site, we can not hold that the mayor and city council was deprived entirely of the general discretion vested in them as to the selection of such site. At most it might be held that the voters, or some of them, approved the selection of the site on the court-house lot, and the determination of the mayor and general council to build the new city hall thereon; but it seems to us that it would be going too far to hold that the voters voted for these bonds upon the condition that their proceeds should be used only for the erection of the new city hall upon the court-house site. At most the voters approved the selection of the court-house site and the decision of the city council to build the new city hall thereon. It can not fairly be held that they made the erection of this city hall upon the court-house lot a sine qua non.

We are of the opinion that the trial judge did not err in refusing the injunction prayed.

*Judgment affirmed. All the Justices concur.*