Charleroi Lumber Company, Appellant, *v.* Bentleyville Borough School District.

Argued March 27, 1939. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN and STERN, JJ.

*Thomas L. Anderson,* with him *C. L. V. Acheson* and *Roy I. Carson,* for appellant.

*Adolph L. Zeman,* with him *F. J. Docktor* and *John J. Moschetta,* for appellee.

OPINION BY MR. JUSTICE STERN, May 8, 1939:

This appeal is by a contractor corporation which was defeated in the court below in an attempt to recover from a school district for labor and material furnished in the erection of a public school building. Two defenses were presented, the one that the cost of the building exceeded the amount authorized by the vote of the electors, the other that plaintiff's contract carried the debt of the district beyond its constitutional limit. The court, upholding the adjudication of the trial judge sitting without a jury, decided—in our opinion properly—that both of these defenses had been sustained. As, however, either one is conclusive against plaintiff's cause of action, the present discussion will be limited to the first.

In 1920, the main school building having been destroyed by fire, it became necessary to erect a new structure. Accordingly the electors were called upon to vote upon a proposed creation of indebtedness in the sum of $85,000 "for the purpose of erecting, completing and equipping a new school building in the School District of the Borough of Bentleyville." A majority of the votes being favorable, bonds were issued from the sale of which $86,759.50 was realized. The board of school directors employed an architect who prepared plans and specifications which the board approved, and due advertising was had. When the bids were examined they were found to be considerably in excess of $85,000—as high as $120,000 or $125,000—and it was obvious, or should have been, that the project could not proceed as planned, there being insufficient money available for the purpose and the proposed cost going far beyond the debt limit.

As the result of consultations, conferences, and advice from various quarters as to how to meet the situation, a device was adopted whereby the original plans for the building were retained but the specifications were changed by omitting plumbing and electric wiring, as

well as plastering and hardware for the first and second floors; the exterior walls, the roof, and rough interior floors, stairs and partitions, were left undisturbed. Contractors were requested to bid again on the revised specifications, and the main contract was awarded to plaintiff on the basis of a net cost of $81,631; at the same time a heating contract in the sum of $15,000 was awarded to another contractor. Of course it would have been impossible to use such a skeletonized building other than for at most a temporary emergency period, the president of plaintiff company himself testifying that he understood that the purpose in changing the specifications was to put up "a shell of a building." Carrying out the new scheme, the school board, a few months after the execution of the contract with plaintiff, awarded plumbing and wiring contracts, and accepted a proposal of plaintiff "to furnish all labor and material necessary to complete the first and second stories of the Bentleyville school building according to plans and specifications of H. W. Altman, architect, for the sum of $27,900," thus covering, in substance, the items which had been excluded from the original contract. Without any competitive bidding or advertising, plaintiff then furnished this and some other additional work and material at a total price of $30,475.30 (of which $1,866.07 is admitted by defendant to have been for legitimate extras). The entire cost of the building when completed, including architect's fees, heating, wiring and plumbing, was close to $136,000, and with land and equipment nearly $147,000. Defendant made various payments to plaintiff on account, aggregating $78,794.82, and paid interest on the balance of its claim down to 1931 (at which time the new building met the fate of the old one and was destroyed by fire), leaving a balance of $34,329.08, to recover which, with interest since 1931, the present suit was brought.

Even a guileless person could scarcely fail to understand and properly appraise the maneuver attempted to

evade the constitution and laws of the Commonwealth. Its failure was predetermined by the decision in the case of *Raff v. Philadelphia,* 256 Pa. 312. There the electors voted for an increase of the indebtedness of the City of Philadelphia in the sum of $9,750,000, which embraced, inter alia, an item of $1,500,000 "for the erection of a convention hall." An architect was employed, plans were prepared, an estimate of $2,225,000 was submitted, and the city authorities were about to advertise for bids and proceed for its construction at that approximate cost, when an injunction was issued by this court, in the exercise of its original jurisdiction, preventing them from entering into contracts for the erection in whole or in part of a convention hall the total cost of which would exceed the amount which the electors had authorized to be borrowed therefor. The court pointed out that the public notice of the election contained, in accordance with statutory requirement, a statement of the purpose and amount of the proposed increase, and that this clause was to enable the voter to act intelligently upon the question submitted to him. The court said (p. 317) : "They [the voters] have a right to insist that what the city authorities so clearly gave them to understand was to be the cost of the hall when they cast their ballots in favor of the increase of the city indebtedness for that purpose, shall not now be ignored by those authorities, for who can say that they would have voted for the increases if they had known the convention hall was to cost hundreds of thousands of dollars more than the sum indicated in the ordinances and in the notices of the elections held in pursuance of them?" In *McAnulty v. City of Pittsburgh,* 284 Pa. 304, the same principle was applied, the court saying (p. 307) : "It is a matter of no moment that the municipal authorities may have thought, when they submitted to the electors the question of increasing the debt for this improvement, that the sum specified would cover the entire expense thereby imposed on the city.

When the contracts were made, they knew the $801,000 would be far from sufficient, and they had no right to then provide for an unlawful increase of the debt. The contractors knew this also, and hence have only themselves to blame if they have commenced performance; for the contracts must be declared void in their entirety." The court further said (p. 309): "Can the city effectively substitute for the requirements of article IX, section 8 of the Constitution of the State, a statement . . . that an indebtedness which violates this provision will, at some indefinite time in the future, 'be provided for from the general city funds'? If it can, then a municipality need only submit to its electors whether or not they will authorize an increase of indebtedness of $1,000, or any greater or lesser sum, and add the excess, however great, to its indebtedness, without providing any means for its payment; thus making of the constitutional provision a rope of sand, wholly insufficient to rescue the electors from the financial wreck of the municipality, which was the only purpose of its adoption."

In *Miller & Sons' Co. v. Mt. Lebanon Township (No. 1)*, 309 Pa. 216, the voters authorized increases of $225,000 in the indebtedness for the purpose of erecting a townhouse. In pursuance of this authority bonds were issued from the sale of which $238,000 was realized. The township commissioners awarded a general contract for the erection of the building at a total cost, with authorized additions, of $189,000. Subsequently contracts for other work and extras were found to be necessary which brought up the final cost of the structure to $242,000. It was not disputed that the commissioners acted in good faith in making the contracts, that the items added as extras were necessary for the proper completion of the building, and that the commissioners did not actually foresee the contingencies which later necessitated expenditures exceeding the funds obtained from the bonds. The court distinguished the case from

the Raff and McAnulty cases, pointing out these facts and that the excess expenditure above the proceeds of the bond issue was less than one and two-thirds per cent of the total cost of the building.

The present situation is entirely different from that in the Miller case. The additions here amounted to approximately 35% of plaintiff's original contract and of the amount of the bonds authorized. These additions, or at least the major portion of them, did not represent work or material the need of which was unforeseen when the contract was first awarded. Instead of the necessity for the so called "extras" developing unexpectedly as the work progressed, they were known from the beginning to be vitally component parts of the structure, and were included in the original plans, which remained unchanged throughout. It was never seriously contemplated that the building should be erected without lighting, plumbing, plaster or hardware. The whole scheme was a subterfuge by which, in the face of an approval by the electors of the construction of a building to cost only $85,000, the school board deliberately erected one costing 60% more, without any idea as to where the necessary additional funds were to be acquired, but hoping that by the method adopted the restrictions imposed by article IX, section 8 of the Constitution and by the decisions of this court in the Raff and McAnulty cases could be circumvented. When the original bids were received, and it was found that the building as planned could not be erected for the sum authorized by the electors nor with adherence to the constitutional debt limit, the board of school directors should have kept within the law and within the financial means of the people of the district. Instead of doing this they, by a transparent artifice, erected a simulacrum of a school building, and then, under the pretense of "extras," completed it according to the plans and cost contemplated from the beginning. The "extras" were, in reality, as much a part of the original contract as if the

specifications, like the plans, had remained unchanged.*

From the weakness of its position thus apparent plaintiff seeks refuge in various validating statutes. The Act of February 20, 1929, P. L. 3 (No. 1), provided that, under certain conditions there specified, contracts theretofore made by a board of school directors for labor, materials and supplies should be valid and binding on the school district notwithstanding the fact that the votes of the directors awarding the contract were not properly recorded in the minutes. The Act of March 28, 1929, P. L. 92, provided that contracts theretofore entered into by a board of school directors for the erection of a school building should, subject to conditions specified in the act, be considered valid notwithstanding certain defects and improprieties in the bids or the advertising, or the execution of the contract in violation of other provisions of the laws of the Commonwealth. The Act of March 30, 1937, P. L. 113, provided for a similar validation of contracts for labor, materials and supplies notwithstanding the fact that there was a failure to advertise for bids, or defects in the advertising, or a failure to comply with the school laws of the Commonwealth regulating the award of such contracts. These three statutes have one feature in common, namely, that the validation for which they provided was conditioned upon the contract not evidencing fraud or conspiracy to violate the provisions of the school laws of the Commonwealth. The most cursory reading of

* Even if plaintiff's contract were considered as being in the amount of $81,631, and the "extras" of $29,609.23 were to be disregarded, the project would still have been invalid as involving a cost in excess of the sum authorized by the electors. At the same time that the contract was entered into with plaintiff a heating contract in the sum of $15,000 was also executed. Architect's fees amounted to $4,831.55. At the very start, therefore, the school district incurred obligations in connection with the proposed building to the extent of $101,462.55. The whole building program must, in this connection, be regarded as an entirety: *Ritter v. Harrisburg School District*, 291 Pa. 439, 445.

these acts makes it plain that what they intended to remedy was the injustice of denying to a contractor the payment to which he was fairly entitled by reason of having furnished material or performed work for a school district in pursuance of a contract entered into in good faith, where the only reason for refusing such payment was a failure on the part of the school board properly to observe some more or less technical requirement of the law in regard to advertising, bidding and the like. The provision that relief was limited to cases where there was no evidence of fraud or conspiracy to violate the school laws shows that the acts were not intended to validate attempts at deliberate evasions of the law. Of course, to the extent to which a violation of *constitutional* requirements is involved there *could* not be any legislative validation. Plaintiff contends that here there was neither "conspiracy" nor "fraud." It is true that the court below held that there was no fraud in the sense that the school directors had any thought or intention of personally profiting by what they did, but the court found that there was "constructive" fraud in that they knowingly exceeded their lawful authority. The words "conspiracy" and "fraud" in these acts are not to be confined to their most technical, legalistic meaning. "Constructive," or, as it is sometimes called, "legal fraud,"—however inept the term—has been used to designate a breach of duty which has a tendency to deceive others and operates to their injury, even though there be no vicious intent. Here, indeed, we have something more than a "constructive" fraud. A plan was adopted for the definite purpose of defeating the law, and the situation, as the court below indicated, was as obvious to the contractor as to the school board. The electors were intentionally deceived. They were led to believe that the new building would be erected, in pursuance of authority given by them, at a cost not exceeding $85,000, but the school board proceeded, in complete disregard of the issue submitted at the polls, to construct a building which cost $136,000.

In the Raff case such conduct was spoken of (p. 317) as "a palpable breach of faith." In the McAnulty case it was characterized (p. 310) as a "fraud" on the electors. Whatever the appropriate designation, for present purposes it is sufficient to hold, as we do, that the validating acts are not available to plaintiff for the protection for which they are invoked.

Plaintiff relies finally upon the doctrine of estoppel, which is said to arise from defendant having paid interest on plaintiff's claim until 1931 and having actually used the school building until that time. The applicability of the principle of estoppel to cases like this has many times been repudiated, because to permit its operation in such situations would be to nullify the purpose of the law. Persons contracting with a governmental agency must, at their peril, know the extent of the power of its officers making the contract. If the validity of the contract depends upon the amount of the agency's permitted indebtedness, the contractor must ascertain its limitations in that regard: *O'Malley v. Olyphant Borough,* 198 Pa. 525, 533; *Kreusler v. McKees Rocks School District,* 256 Pa. 281; *Willis v. York County Directors of the Poor,* 284 Pa. 138, 143; *Jackson v. Conneautville Borough School District,* 280 Pa. 601, 606. Nor was defendant estopped by reason of its acceptance and retention of the benefits of plaintiff's contract, since by their very nature these could not be surrendered: *Luzerne Township v. Fayette County,* 330 Pa. 247, 253.

While there may seem to be a measure of hardship in the unfortunate position in which plaintiff finds itself, it must be remembered that it entered into the project with its eyes open and with knowledge of all the attendant facts and circumstances, and it should have realized the danger which it courted by reason of the condition of the finances of the school district and the established mandates of the law.

The judgment is affirmed.