## Wilds et al., Appellants, *v.* McKeesport City School District.

Argued September 26, 1939.  Before Kephart, C. J.,
Schaffer, Maxey, Linn, Stern and Barnes, JJ.

*W. Denning Stewart,* with him *Stewart & Lewis* and *William J. Kenney,* for appellants.

*William Alvah Stewart,* City Solicitor, *W. W. Stoner,* and *Anne X. Alpern,* First Assistant City Solicitor, for intervening appellants.

*Hill Burgwin* and *N. A. Calhoun,* with them *Burgwin, Schully & Churchill,* for appellee.

OPINION BY MR. JUSTICE STERN, November 27, 1939:

At an election held on November 8, 1927, there was presented to the voters of the School District of the City of McKeesport the question whether its bonded indebtedness should be increased. The School Board published notice of the election, stating that "The proposed increase of indebtedness of said School District is for the following purpose or purposes, namely: One Million Five Hundred Thousand ($1,500,000.00) Dollars for the purpose of erecting, constructing, repairing, remodeling, enlarging, equipping and furnishing buildings for elementary and high schools in the School District in said City." The proposition having been approved by a majority of the voters, the sum of $1,080,000 of the amount realized from the bonds was expended during the succeeding eleven years for the purpose thus set forth. On November 16, 1938, the Board of Directors authorized the purchase of a site in Versailles Township, which adjoins the City of McKeesport on the east, upon which to erect a vocational school building. Notwithstanding protests made by various taxpayers and questions raised as to the legality of the undertaking, the School District has taken title to the site thus selected, has paid for the land, and has awarded contracts for the necessary excavation and the construction and equipment of the building. The indicated cost of the

entire project is approximately $1,071,000. The School
District proposes to meet this expense from the $420,000
remaining òf the 1927 bond issue, the sum of $280,000
realized from a bond issue which was authorized by the
Board of Directors on December 5, 1938, under their
2% borrowing power, and a grant by the Public Works
Administration of 45% of the cost of the erection and
15% of the cost of acquiring the site.

Plaintiffs, taxpayers of the School District, brought
a bill in equity to enjoin it from expending its funds
on the proposed project. The question is whether the
$420,000 balance of the bond issue authorized in 1927
can be used for the purpose now contemplated by de-
fendant. The court below dismissed the bill.

To implement Article IX, section 8, of the Constitu-
tion, section 3 of the Act of April 20, 1874, provides that
when the question of increasing the indebtedness of
any school district or municipality is submitted to the
voters, the proper authorities shall publish a notice of
the proposed election, and such notice shall contain,
inter alia, a statement of the purposes for which the
indebtedness is to be increased. The courts have rigidly
insisted that the proceeds of a bond issue authorized by
the electors shall be used by the corporate authorities
in strict accordance with the purposes stated in the
official proclamation of the election. Any diversion of
the money from such purposes would constitute fraud
and amount to a grave breach of faith: *Major v. Aldan
Borough,* 209 Pa. 247; *Wolff Chemical Company v.
Philadelphia,* 217 Pa. 215; *Raff v. Philadelphia,* 256 Pa.
312; *Charleroi Lumber Co. v. Bentleyville Borough
School District,* 334 Pa. 424.

In order to establish that defendant's project involves
a purpose not in conformity with the submission of the
question to the voters in the election of 1927, plaintiffs
produced evidence that the Board of Directors, imme-
diately preceding that election, advertised in the public
press of McKeesport that no land would have to be

purchased for a new high school building as the School District had ample sites available, that there was sufficient ground in the rear of the then existing high school on which to build a new structure, and that only $600,000 would be used for that purpose. It is not necessary to decide whether this advertising, which was purely voluntary on the part of the Board and without statutory mandate or authority, is relevant as modifying or interpreting the purpose officially stated in the notice of the election,[1] for, even if such advertising be disregarded, defendant's present plan deviates in two respects from the purpose stated in the proclamation itself: (1) A vocational high school is not within the connotation of the term "high schools" as used in the notice of the election; (2) The erection of a building outside of the school district is not within the proclaimed purpose of "erecting . . . buildings . . . in the School District in said City."

In *Borough of Falls Creek v. Washington Township,* 114 Pa. Superior Ct. 380, the question involved was whether some pupils residing in Washington Township, Jefferson County, should be allowed to attend the high school in the Borough of Falls Creek. The School Code of May 18, 1911, P. L. 309, sec. 1707, provided that pupils residing in a school district in which no public high schools were maintained might attend a high school in another district most convenient to their homes. Washington Township maintained a vocational school, but the court held that this was not a "high school" within the meaning of the act. After reviewing

---

[1] See *Detroit United Ry. v. City of Detroit,* 255 U. S. 171, 179; *West Missouri Power Co. v. City of Washington,* 80 Fed. Rep. (2d) 420; *Town of Platteville v. Galena & Southern Wisconsin R. R. Co.,* 43 Wis. 493; *Nalle v. City of Austin,* 85 Tex. 520, 22 S. W. 668; *Allen v. City of Atlanta,* 166 Ga. 28, 142 S. E. 262; *Kansas Electric Power Co. v. City of Eureka,* 142 Kan. 117, 45 Pac. (2d) 877; *Dethoff v. School District of the City of Reading,* 17 Berks County L. J. 213.

some of the legislation governing the public school system and the statutes providing for the establishment and maintenance of vocational and other special schools, the court concluded that all of the acts recognized "a distinct cleavage between academic high schools and vocational schools."

That decision is far from being a technical one. Throughout our statutory law vocational schools have been sharply differentiated from ordinary high schools. The first comprehensive statute introducing vocational schools into our educational system as separate schools was the Act of May 1, 1913, P. L. 138, which defined "vocational education" as meaning "any education the controlling purpose of which is to fit for profitable employment," and embracing industrial, agricultural and household arts education. Just as the School Code of 1911 had provided that a pupil in a district where there was no high school should be allowed to attend a high school in another district, so this act provided that a resident of a school district not maintaining a vocational school might, under certain conditions, attend such a school maintained by another school district. By the Act of May 6, 1915, P. L. 268, there was created a separate Bureau of Vocational Education, made up of an Agricultural Division and an Industrial Division. By the Acts of July 11, 1917, P. L. 757, and May 28, 1937, P. L. 1004, the Commonwealth accepted provisions of acts of Congress which provided grants for the promotion of vocational education, and ever since then the State has received substantial support from the federal government for its system of vocational schools. In the Act of May 1, 1925, P. L. 418, "vocational education" was re-defined as "any form of education of less than college grade, given in school or elsewhere, the purpose of which is to fit an individual to pursue effectively a recognized profitable employment, whether pursued for wages or otherwise," and the forms which it embraced included vocational industrial, vocational agricultural,

vocational commercial, and vocational home economics education; these various forms, it was stated, "shall mean a distinctive organization of courses, pupils, and teachers approved by the State Council of Education . . ." The Act of May 21, 1931, P. L. 176, added a definition of "technical industrial education" as meaning "that form of vocational industrial education that prepares for occupations of a semi-professional character." The Act of July 1, 1937, P. L. 2548, provided that the State Council of Education should act specially as the State Board for Vocational Education for the establishment and maintenance of vocational schools, and to the forms of vocational education included in former acts was added that of "vocational distributive occupational education," defined as meaning "those forms of vocational education designed for those workers engaged in or preparing for employment as distributors to consumers, retailers, jobbers, wholesalers, and others; the products of farm and industry, including, also, managers operating or conducting a commercial service or personal service business, or selling the services of such a business." This act further provided that the State Board for Vocational Education should provide for vocational schools, with the necessary staffs, in accordance with the State Plan for Vocational Education, approved by the Federal Board for Vocational Education. Finally, by the Act of July 1, 1937, P. L. 2603, each school district of the Commonwealth was constituted a separate political subdivision to be known as a vocational school district, the affairs of such vocational school districts to be conducted by the boards of school directors, who, when so acting, should be known as Boards of Directors of Vocational Schools. These vocational school districts are, under certain circumstances, to establish and operate vocational industrial, vocational agricultural, vocational home-making, and vocational distributive occupational schools when the same have been authorized by the electors of the district.

This summary of some of our vocational school legislation shows clearly that vocational schools have been consistently treated as entirely distinct and apart from high schools of the historic, academic character. When these acts refer to the regular traditional high schools they speak of them merely as "high schools," whereas "vocational high schools" are specifically so designated, as a separate class. Indeed, the School Code of 1911 (section 401) and its amending Acts of May 24, 1921, P. L. 1066, and May 29, 1931, P. L. 243, in enumerating the various schools which may be established by school boards, list separately "high schools" and "vocational schools."

Apart from this treatment of vocational schools in the statutes, such schools are in fact different from ordinary high schools in vital respects. Whereas the high school curriculum consists principally of what are commonly designated as "cultural" subjects,—history, rhetoric, literature, languages, and elementary principles of science—the major portion of the instruction in vocational schools is through work in shops, laboratories and drafting rooms; most of the academic subjects that are also taught there are correlated to the vocational instruction. When a pupil finishes the elementary schools, his admission to a vocational school is conditioned upon qualifications not applying to the academic high school, and the teachers' qualifications are, of course, also different. The physical plant of a vocational school is more elaborate and the cost of education therein considerably higher, thus involving a greater expenditure of public funds. The immediate purposes of the two systems of education are fundamentally distinct. On the whole, a vocational school is more analogous to a professional school than to the ordinary high school.

It is plain, therefore, that, whether regarded from the standpoint of the phraseology of the statutes or from that of the popular, natural and ordinary mean-

ing of the term "high schools,"[2] especially in the period of the 1927 election, the erection of a vocational school cannot be regarded as having been within the purpose set forth in the official proclamation of the election. Hence the money derived from the sale of the bonds then authorized cannot be used for the proposed structure.

Another fatal objection to the project arises from the fact that the notice of the election stated that the purpose was to erect buildings for elementary and high schools *"in the School District in said City."* In the interpretation of that limiting phrase the situation must be viewed as of the date when the electors authorized the increase of the debt: *Addyston Pipe & Steel Co. v. City of Corry,* 197 Pa. 41, 48; *Duane v. Philadelphia,* 322 Pa. 33, 37. That the Act of April 27, 1925, P. L. 348, gave a school board the power to buy or condemn vacant land in another school district and erect school buildings thereon is wholly immaterial. In determining whether to ratify a proposal for the building of a high school, its location, especially with reference to its proximity to their homes, would naturally be a vital consideration in the minds of the electors, and when, by their votes, they here authorized the building of schools in the City of McKeesport, they cannot fairly be held to have intended a grant of permission to locate schools outside of the city, even though the School Board might have such statutory power. True, it is stated on the record that steps have been taken to annex the proposed site to the City of McKeesport. It does not appear whether this has been finally accomplished, but, in any event, the purpose as declared in the notice of the election prevails, and cannot be construed to justify a location of school buildings outside of McKeesport as the city existed when the vote was taken.

---

[2] "The words of the notice of the election were to be understood by them [the electors] in their popular, natural and ordinary meaning": *Raff v. Philadelphia,* 256 Pa. 312, 316.

The barring of relief to plaintiffs on the ground of laches is unwarranted, since the School Board was notified of the objections on the part of plaintiffs and other taxpayers but nevertheless proceeded to put the plan into operation; the present proceedings in equity promptly followed. While the situation is highly regrettable, it is of paramount importance that municipal and school authorities should be held to strict compliance with legal requirements in the transaction of public affairs. If a majority of the electors of the school district now approve of the proposed site in Versailles Township, and the construction of a vocational school there, a way is afforded to them by the Act of December 27, 1933 (Special Sess.) P. L. 123, to validate the project by means of a new election.

The decree of the court below dismissing plaintiffs' bill is reversed, and the record is remanded with directions to enter a decree enjoining and restraining defendant school district, its officers, directors and agents, from expending on the project described in the bill the $420,000 or any part thereof realized from the bonds authorized in 1927; costs to be paid by defendant.