TITAN ENVIRONMENTAL CONSTRUC-
TION SYSTEMS, INC.

v.

The SCHOOL DISTRICT OF
PHILADELPHIA.

Civ. A. No. 74–317.

United States District Court,
E. D. Pennsylvania.

Oct. 21, 1976.

Steven A. Arbittier, Philadelphia, Pa., for plaintiff.

Martin Horowitz, Philadelphia, Pa., for defendant.

MEMORANDUM AND ORDER

BECHTLE, District Judge.

Plaintiff, Titan Environmental Construction Systems, Inc. ("Titan"), brought this action against the School District of Philadelphia ("School District"), seeking compensation for architectural services rendered by it to the School District. The case was tried, non-jury, before this Court. After careful consideration of the conflicting testimony and exhibits presented at trial, the Court makes the following findings of fact and conclusions of law.

FINDINGS OF FACT

1. Titan is a corporation organized and existing under the laws of, and with its principal place of business in, the State of Maryland. Titan is in the business of designing and constructing school and other commercial buildings. Titan employs a systems approach to construction, which generally denotes that the building and all of its component parts are pre-engineered and, in some instances, prefabricated so as to permit easy assembly at the construction site.

2. The School District is a political subdivision of the Commonwealth of Pennsylvania, created pursuant to the Public School Code of 1949, 24 P.S. §§ 1–101 et seq.

3. Titan was first contacted by the School District in 1969. James L. McIntyre, the president of Titan, received a telephone call from a staff member of the School District who requested that representatives of the School District be given a tour of certain buildings which Titan had constructed in Baltimore, Maryland. The tour was arranged and was attended by Edward W. Deissler, the then Director of Architecture, Engineering and Construction Services for the School District, and several members of his staff.

4. In March of 1971, Mr. McIntyre received another telephone call from a Mr. Mowbray of the School District who also requested a tour of Titan-constructed buildings. In August of 1971, Mr. Mowbray and Dr. Michael P. Marcase, the then Deputy Superintendent for Planning of the School District, were given a tour of buildings which Titan had constructed in Chicago, Illinois.

5. The Chicago tour was followed by several meetings between representatives of Titan and those of the School District, which took place in September, October and December of 1971. The purpose of these meetings was for Titan to familiarize the School District with the mechanics of Titan's systems approach to construction, and for the School District to familiarize Titan with its various educational requirements with respect to new school buildings.

6. At a meeting held on December 22, 1971, Titan was informed that the School District had decided to construct two systems-built Titan schools, and that Titan would serve in a management relationship in constructing those schools.

7. On January 19, 1972, a meeting was held at the request of the School District in Dr. Marcase's office. The meeting was described as the "kick off" meeting. It was attended by Dr. Marcase and several other members of the School District staff, including people specializing in architecture, engineering, facilities planning and education. Attending for Titan were Mr. McIntyre, John Newby, Titan's director of new business, and Peter Moore, Titan's lead architect. At that meeting, Dr. Marcase posed numerous questions to the Titan staff. Following the questioning, Dr. Marcase stated that a decision had been reached to build two Titan schools.

8. During that same meeting, and at subsequent meetings through the Spring of 1972, it was agreed that Titan would prepare drawings, specifications and equipment lists for two school buildings, as well as for an addition to a third school building. Those drawings, specifications and equipment lists ultimately formed the "bid documents" for the projects, i. e., the documents

which bidders were to review and upon which they were to base their bids.

9. The School District agreed that it would construct the two school buildings, as well as the addition to a third school building, based upon the drawings, specifications and equipment lists which Titan would prepare. The School District further agreed, as the sole consideration for Titan's services, that the contract for the construction of these buildings would be awarded on the basis of competitive public bidding, and that Titan would have the opportunity to bid as well as the possibility of being awarded the contract if it was the lowest responsible bidder.

10. The Board of Education of the School District approved the proposed construction of two Titan experimental systems school buildings and an addition to a third school building and approved the competitive public bidding for those buildings in which Titan would be given the opportunity to bid.

11. Finally, at the meeting of January 19, 1972, a question was raised by Titan concerning the legality of soliciting bids for school construction projects involving only a single prime construction contract. The question was asked because the Public School Code of 1949, 24 P.S. § 7–751 (Supp. 1976), requires, with certain exceptions, that contracts for school construction be entered into with four separate prime contractors, as opposed to one. In light of Titan's systems approach to construction, it would not have been feasible for Titan to have bid for these projects, unless the entire contract was awarded to the successful bidder.

12. Titan was advised by the School District, both at the January 19 meeting and on other subsequent occasions, that, in light of an exception in § 7–751 pertaining to prefabricated buildings, the contemplated Titan projects could be legally let on a single prime construction contract basis.

13. When the School District made the decision to build two school buildings and an addition to a third based on the Titan design, it was acting under the assumption that those projects would be funded, in whole or in part, by the Commonwealth of Pennsylvania through the Commonwealth's Department of Education. The School District, no later than February, 1972, realized the necessity of confirming with the Department of Education that funding for the Titan projects would in fact be available. However, the School District made no such request for confirmation to the Department of Education until the third week of July, 1972, which was after Titan had completed its services and after the public had been invited to bid on the Titan-designed projects. Notwithstanding the fact that the School District did not check with the Department of Education until July, the School District informed Titan by February, 1972, that it had received the necessary Department of Education approvals.

14. During the period of approximately January 19, 1972, to June 15, 1972, Titan performed services on behalf of the School District. These services included:

(a) preparing schematic drawings and final bidding drawings for two school buildings and an addition to a third school building;

(b) preparing a complete set of final specifications for two school buildings and an addition to a third school building; and

(c) preparing detailed equipment lists for two school buildings and an addition to a third school building.

15. In March of 1972, Titan, at the request of the School District, conducted a second tour of Titan schools located in Chicago for School District personnel, including Dr. Philip Davidoff, a member of the Board of Education, and the Deputy Mayor of Philadelphia, Anthony Zecca.

16. In late March, 1972, after Titan had already performed substantial design work, the School District requested an architectural change of the exterior portions of the contemplated school buildings, from a porcelain panel concept to a gravel concrete panel concept. The School District requested the change because of comments made by Deputy Mayor Zecca following the

Second Chicago tour. In order to comply with the School District's request, Titan was required to spend additional time redesigning the interior dimensions and making new structural calculations for the three school buildings.

17. At the specific request of the School District, Titan prepared a model of a typical Titan-type school for the School District's use in connection with a television presentation. It cost Titan $2,528.58 to prepare that model, and the School District intended to reimburse Titan for that expense.

18. On or about June 15, 1972, Titan completed the performance of its services for the School District.

19. The fair market value of the services performed by Titan on behalf of the School District, during the period of approximately January 19, 1972, to June 15, 1972, is $68,500. This figure is the sum of the following elements:

(a) $49,500 for professional services in the preparation of drawings and specifications;

(b) $5,000 for the preparation of the complete set of final specifications;

(c) $9,000 for the preparation of equipment lists; and

(d) $5,000 for the additional work Titan performed in order to comply with the requested architectural change.

20. The three school projects which Titan had designed were advertised by the School District for public bidding on or about June 15, 1972. The advertisement was based on the drawings, specifications and equipment lists which Titan had prepared.

21. On or about July 18, 1972, the School District suspended the bidding for the three school projects. Those projects, as designed by Titan, were never built, and Titan was never afforded an opportunity to bid on those projects.

22. The bidding on the three projects was suspended by the School District as a result of its being informed by the Department of Education of the Commonwealth of Pennsylvania, in July, 1972, that the Commonwealth would not subsidize the three projects. The Commonwealth's decision was based on the Pennsylvania Department of Education's belief that the proposed single contract award would contravene § 7–751's requirement of four prime contractors, and that the Titan projects did not fall within § 7–751's prefabrication exception.

23. Titan has never been paid for any of the services it rendered to the School District as described above.

## DISCUSSION

■ Titan's amended complaint contains six counts which set forth alternative theories of recovery based on the same set of facts. Count I alleges that Titan and the School District entered into an oral agreement wherein the School District agreed to pay for Titan's services, and that the School District breached that agreement when it refused to pay Titan. In Counts II and III, Titan seeks the fair and reasonable value of its services based on the theories of quantum meruit and unjust enrichment, respectively. Count IV alleges that Titan and the School District entered into an oral agreement wherein the School District agreed, in consideration for Titan's services, to give Titan the opportunity to bid on the projects for which Titan had prepared the drawings, specifications and equipment lists, and that the School District breached that agreement. Count V alleges that, in reliance upon the School District's promise that it would give Titan the opportunity to bid on the projects, Titan performed substantial services for the School District, and that it breached that promise. Count VI alleges that the School District was negligent in instructing Titan to proceed with the projects, without first having made appropriate inquiries as to whether reimbursement would be available from the Pennsylvania Department of Education, and in informing Titan that there would be no legal impediment to a single contract, as opposed to a four prime contract, award. Finally, as allegedly developed at trial, Titan con-

tends that it is entitled to recover on the theory of misrepresentation.[1]

With respect to Titan's contentions that it is entitled to damages based upon the alternative theories of breach of oral agreement (Count I), quantum meruit, unjust enrichment, promissory estoppel, negligence and misrepresentation, the Court believes that the evidence does not support a recovery based upon any of those theories. The Court does believe, however, that the evidence clearly supports a recovery based upon breach of the oral agreement alleged in Count IV. A review of the testimony and the exhibits reveals that, at the January 19 "kick off" meeting and at subsequent meetings, Titan and the School District agreed that, in return for Titan's services, the School District was to afford Titan the opportunity to bid on three school building projects and that the "bid documents" were to be based on Titan's work product. The evidence further shows that Titan's services, as agreed to at the January 19 meeting and as further developed through the Spring of 1972, were to include the preparation of drawings, specifications and equipment lists for two school buildings and an addition to a third school building. That agreement was breached when the School District withdrew the three projects from public bidding. For the breach of that agreement, Titan is entitled to recover the reasonable value of the services it rendered to the School District.[2]

The School District contends that even if there was an oral agreement to the effect that, in consideration for Titan's services, Titan would be given the opportunity to bid on the projects, Titan still may not recover since there was no written contract between the parties approved by the Board of Education at a formal board meeting. In support of this contention, the School District principally relies upon the Public School Code of 1949, 24 P.S. § 5–508 (Supp.1976), which provides in pertinent part:

> The affirmative vote of a majority of all the members of the board of school directors in every school district, duly recorded, showing how each member voted, shall be required in order to take action on the following subjects:—
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> Entering into contracts of any kind, including contracts for the purchase of fuel or any supplies, where the amount involved exceeds one hundred dollars ($100).
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> Failure to comply with the provisions of this section shall render such acts of the board of school directors void and unenforcible.

It further relies upon the well-settled principle that a person who contracts with a governmental agency must, at his peril, know the extent of the power of its officers to make the contract. See *Charleroi Lumber Co. v. Bentleyville Borough School District*, 334 Pa. 424, 433, 6 A.2d 88, 92 (1939); *School District of Philadelphia v. Framlau Corp.*, 15 Pa.Cmwlth. 621, 328 A.2d 866, 870 (1974).[3]

---

1. Although Titan's misrepresentation theory was not specifically pleaded in either the original or the amended complaint, Rule 15(b) of the Federal Rules of Civil Procedure allows "issues not raised· by the pleadings [but which] are tried by express or implied consent of the parties, [to] be treated in all respects as if they had been raised in the pleadings." Accordingly, since Titan offered evidence in support of its misrepresentation theory at trial, the fact that it was not raised in the pleadings does not bar a recovery based upon that theory.

2. *See* Restatement of Contracts § 347 (1932).

3. Titan contends that the School District cannot rely upon § 5–508 as a defense to Titan's claim of breach of oral agreement, since the School District failed to assert the defense in its answer to the complaint or answer to the amended complaint. In support of its contention, Titan relies upon Rule 12(b) of the Federal Rules of Civil Procedure, which provides in pertinent part that "[e]very defense, in law or fact, to a claim for relief in any pleading, . . . shall be asserted in the responsive pleading thereto if one is required . . . ." Were it not for the protection afforded by Rule 12(h)(2), we would agree with Titan that the School District waived its § 5–508 defense when it failed to raise it by motion or in the responsive pleadings. Rule 12(h)(2) provides:

> A defense of failure to state a claim upon which relief can be granted, a defense of failure to join a party indispensable under

■ Accepting for the moment the School District's contention that the agreement between it and Titan had to be approved by the Board of Education, it is not necessary for Titan to establish that approval through evidence of a formal vote recorded in the minutes. *Mullen v. DuBois Area School District*, 436 Pa. 211, 259 A.2d 877 (1969). *Mullen* involved a mandamus action by a teacher against a school board to compel reinstatement. The board contended that there was no valid and enforceable contract between it and Mullen since there was no recorded vote of the board with respect to that contract. The Pennsylvania Supreme Court rejected the board's argument. The Court held that the requirement of a formal recorded vote was directory, rather than mandatory, in nature, and that "the expression of the board members' approval required by [§ 5–508] can be evidenced in ways other than by a formal vote recorded in the minutes." 436 Pa. at 216, 259 A.2d at 880. The Court cautioned, however, "that the proof from which Board approval can be inferred must be solid." *Id.* Finally, the Court agreed with the trial court's finding that the evidence sufficiently established board approval of the Mullen appointment. Specifically, the trial court relied on the facts that a written contract signed by Mullen was also signed by the president and secretary of the board, and that, during his year of employment, Mullen was personally commended at a board meeting for having received a teacher's award from the Pennsylvania Department of Public Instruction.[4]

■ There is no question that the evidence in this case establishes that the Board of Education approved the agreement between the School District and Titan by which Titan was to be given the opportunity to bid in return for its services. Specifically, at a meeting on or about January 12, 1972, the Board approved two experimental Titan system prototype buildings on the assurances that the Titan system was competitive and that other contractors would be eligible to bid on the projects. Furthermore, it is clear that the Board approved not only two new school buildings, but also an addition to a school building. This is evidenced in the bid documents advertised by the School District and the Board of Education on or about June 15, 1972, which were, in large part, based upon Titan's work product. In light of these facts, it is impossible to believe that the Board of Education did not know that Titan was rendering its services to the School District in return for the opportunity to bid and that they did not approve of such an agreement.

With respect to the January 12, 1972, Board meeting which approved two Titan-type school buildings, the School District points to the fact that the meeting was a "conference" meeting and not a "formal" board meeting. We fail to see the relevance of such a distinction. *Mullen* does not require a showing that the Board's approval was given at a "formal" meeting, but only a showing that, in fact, approval was given. The question is not *how* or *when* the Board approved the agreement, but *if* they approved it. It is clear in this case that such approval was given.[5]

Rule 19, and an objection of failure to state a legal defense to a claim may be made in any pleading permitted or ordered under Rule 7(a), or by motion for judgment on the pleadings, or at the trial on the merits.

Since the School District's defense would properly be raised in a Rule 12(b)(6) motion alleging failure to state a claim upon which relief can be granted, and since the School District's counsel raised this defense in his opening statement at trial, [*see* N.T. 7], the Court holds that the School District did not waive its alleged § 5–508 defense.

4. The Court notes that the holding of the *Mullen* case is not limited to school board actions with respect to teacher contracts. In *Kennedy*

*v. Ringgold School Dist.*, 10 Pa.Cmwlth. 191, 309 A.2d 269, 272 (1973), the court held that *Mullen* is also applicable to board actions with respect to contracts for architectural services.

5. In its Post-Trial Memorandum, Titan argues that § 5–508 is not applicable to the factual situation presented in this case. Titan points to the fact that the language of § 5–508 is framed in terms of entering into contracts where the amount involved exceeds $100, *i. e.*, where the School District is itself expected to pay out more than $100. Since the consideration for Titan's services was only the opportunity to bid on the three school projects, and since the School District's obligations to Titan would have been extinguished if Titan has not

Finally, the School District contends that the absence of a written contract precludes recovery by Titan. The Court has not been cited to, nor are we aware of, any Pennsylvania statute or case law which requires a contract for architectural services to be in writing. The explanation for such a lack of authority is simply that a written contract is not required. *Compare Kennedy v. Ringgold School District*, 10 Pa.Cmwlth. 191, 309 A.2d 269, 272 (1973). A written contract with the School District is only necessary when it is required by statute. For example, 24 P.S. § 11–1121 requires that all teachers' contracts must be in writing. *See Department of Education v. Jersey Shore Area School District*, 353 A.2d 91 (Pa.Cmwlth.1976); *Gordon v. Board of Directors*, 21 Pa.Cmwlth. 616, 347 A.2d 347 (1975). In the absence of a statutory prescription that contracts for architectural services be in writing, the Court perceives no reason why it should impose such a requirement.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1), since the citizenship of the parties is diverse and the amount in controversy, exclusive of interest and costs, exceeds $10,000.

2. The School District and Titan entered into an oral agreement wherein Titan agreed to perform various architectural services for the School District and the School District agreed, as consideration for Titan's services, to put three school building projects out for public bidding based upon the drawings, specifications and equipment lists prepared by Titan. Titan was to be afforded the opportunity to bid on those projects. This agreement was approved by the Board of Education of the School District.

3. The School District breached the above agreement when it withdrew the projects from bidding, thereby depriving Titan of the opportunity of bidding on those projects.

4. As a direct result of the School District's breach of agreement, Titan has sustained damages in the sum of $71,028.58. That sum consists of $68,500 for the fair and reasonable value of Titan's services, plus $2,528.58, which represents the expense incurred by Titan in furnishing the model to the School District.

5. Titan is entitled to a judgment against the School District in the sum of $71,028.58.

Any factual references under "Discussion" shall be considered as our Findings of Fact in addition to those set forth under "Findings of Fact," *supra*, and any conclusions of law contained in "Discussion" shall be deemed our Conclusions of Law in addition to those set forth in "Conclusions of Law," *supra*.

An appropriate Order will be entered.

been the successful bidder, Titan argues that no consideration with a value of more than $100 would have been given by the School District to Titan. Only if Titan had been the successful bidder and only if Titan and the School District had entered into a construction contract, Titan concludes, would the contract have to have been approved in accordance with § 5–508. Although Titan's argument is an appealing one, the Court need not address it at this time since, assuming § 5–508 is applicable to the present factual situation, we believe, for the reasons stated above, that the requisite board approval was established by Titan.