**Jodie B. LICHTENSTEIN, an individual, Plaintiff,**

v.

**KIDDER, PEABODY & CO. INCORPORATED, a Delaware corporation, Defendant,**

v.

**Alan I. LICHTENSTEIN, Third-Party Defendant.**

Civ. A. No. 89–1143.

United States District Court, W.D. Pennsylvania.

Dec. 17, 1993.

Richard R. Nelson, II, Alder, Cohen & Grigsby, P.C., Pittsburgh, PA, for defendant.

Barry J. Palkovitz, Palkovitz Steinberg, McKeesport, PA, for third-party defendant.

## *OPINION*

COHILL, District Judge.

Plaintiff Jodie B. Lichtenstein, a Pennsylvania resident and a former client of defendant Kidder, Peabody & Co., Incorporated ("Kidder Peabody"), a Delaware corporation, alleges that she lost substantial amounts of money as a result of unauthorized transactions in her account and the payment of funds from her account over her forged signature on Visa checks. Third-party defendant, Alan I. Lichtenstein, who is plaintiff's ex-husband, admits that he forged her signature, but argues that Kidder Peabody is strictly liable for his misdeeds. Mrs. Lichtenstein charges Kidder Peabody with conversion, negligence, breach of fiduciary duty, and breach of express and implied contract for its involvement in these transactions. This court has jurisdiction pursuant to 28 U.S.C. § 1332 due to the diversity of citizenship of the parties.

We held a three-day bench trial on this case. Pursuant to Fed.R.Civ.P. 52(a), we make the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

Plaintiff Jodie Lichtenstein was married to Alan Lichtenstein in 1973. The marriage produced two children and ended in divorce in 1988.

Mrs. Lichtenstein has virtually no experience in investments or money management. She graduated from Monticello Junior College, briefly attended the University of Miami and has never taken any courses in business, accounting or financial management. Her employment history comprises mainly of retail display work and retail sales. Mr. Lichtenstein, on the other hand, has had substantial experience in investments and money management.

During their marriage, Mr. Lichtenstein exercised nearly unilateral control over all financial affairs of the couple. Mrs. Lichtenstein never held an individual savings account or an individual checking account. Rather, she and her husband had a joint checking account and a joint savings account, over which Mr. Lichtenstein exercised exclusive authority. Mr. Lichtenstein had his own separate checking account as well.

Mr. Lichtenstein entered the marriage with substantial amounts of family money. He engaged a Paine Webber broker, Charles Chewning, Jr., on numerous occasions beginning in the early 1980s to handle various investments and securities transactions. Mr. Chewning began his employment with defendant Kidder Peabody in late 1982 as a registered representative/stock broker. Mr. Lichtenstein kept his accounts with Mr. Chewning when Mr. Chewning became employed by Kidder Peabody. At all relevant times herein, Mr. Chewning was acting within the scope of his employment at Kidder Peabody. He was compensated on a commission basis.

### A. OPENING THE ACCOUNT

In March 1985, Mrs. Lichtenstein, upon advice of her family, considered selling her 3,000 shares of stock in Glosser Brothers, Inc. because the stock price was increasing. This stock had been given to her by her parents. Upon her husband's recommendation, Mrs. Lichtenstein spoke with Mr. Chewning over the phone regarding the stock price fluctuation. He sold the stock for her, which yielded $59,996.19. Pl.'s Ex. 28. Mrs. Lichtenstein did not sign any papers or stock certificates to complete the transaction.

When the Glosser Brothers stock was sold, the proceeds were deposited initially into the Lichtenstein's joint Premium Account ("the joint account") at Kidder Peabody, which is not the subject of this lawsuit. Mrs. Lichtenstein was unaware of the existence of the joint account, which had been opened by Mr. Chewning with the authorization of Mr. Lichtenstein. Mr. Lichtenstein forged Mrs. Lichtenstein's signature on the new account documentation for this joint account. Pl.'s Exs. 6 and 7. The joint account documentation fails to include Mrs. Lichtenstein's social security number, address and phone number. The joint account was, in effect, treated by Kidder Peabody as an individual account held by Mr. Lichtenstein. This is evidenced by the answers to the account request form, Ex. 30, which emphasizes Mr. Chewning's dealings in options and only lists Mr. Lichtenstein as the customer. Mr. Chewning considered Mr. Lichtenstein an "active customer."

On April 8, 1985, Mrs. Lichtenstein met with Mr. Chewning for the first time to open her own Premium Account ("the account") with Kidder Peabody. Her initial deposit was in excess of $200,000, comprised of her life savings and proceeds from the Glosser Brothers stock sale in the amount of $48,966.19. Months later, on September 17, 1985, $209,567.25 was deposited into plaintiff's account, from the proceeds of another Glosser Brothers stock sale.

Premium Accounts require an initial deposit of over $25,000. The accounts customarily feature a securities margin account and a no-load money market mutual fund. They are central asset management accounts which allow the customer to deposit cash and securities and, through a program administered by Kidder Peabody in connection with Bank One of Columbus, N.S., to draft checks against these assets or to charge expenses to a Visa card. Premium Accounts also have speedy re-investment, or "sweep" feature. This is in contrast to standard accounts, in

which Kidder Peabody merely buys and sells securities with dividend payments to the customer.

When Mrs. Lichtenstein opened her account, Mr. Chewning advised her that she had to contract for either the checking or the Visa card option; she opted for the checking account. She expressed her intention to Mr. Chewning that the principal amount would be available for investment purposes and that it would remain untouched by any of her checking account withdrawals. On advice of her parents, she also expressed her desire that the account be diversified so as to ensure a secure portfolio. She trusted Kidder Peabody's guidance in making the investments based on their outstanding reputation in the investment community.

The initial meeting between Mrs. Lichtenstein and Charles Chewning lasted less than an hour. She signed and executed the following agreements: Client Information Form (Pl.'s Ex. 2); the Premium Account Agreement (Pl.'s Ex. 3); the Securities Account Agreement (Pl.'s Ex. 4); and the Visa Account Application and Agreement—Bank One (Pl.'s Ex. 5). She testified that she was never told of the risk or dangers in opening a premium account.

Boyd S. Murray, Vice President of Kidder Peabody and Branch Manager of the Pittsburgh office since 1988, explained that fraud and forgery are always risks with such accounts, a fact which is reflected in the Kidder Peabody Manual, Pl.'s Ex. 24. The registered representative must advise customers of the Premium Account that the check writing feature creates a risk of fraud. Mr. Murray, incidentally, was not the branch manager during the time the events described here occurred. The late Thomas C. Ryan, Sr. was.

Kidder Peabody requires that their registered representative, in this case Mr. Chewning, fill out a New Account Request Form, Pl.'s Ex. 1, which must be approved by the branch manager. A number is assigned to the account when the manager approves the opening of the account. Most notable about Mrs. Lichtenstein's New Account Request Form are the following facts: (1) it lacks her residential address, (2) it indicates Mr. Lichtenstein's age, not hers; (3) it states that Mr. Chewning knew Mrs. Lichtenstein for seven years, which is actually the length of time Mr. Chewning knew Mr. Lichtenstein; (4) it cross-references to Mr. Lichtenstein's other accounts for the appropriate phone numbers; and (5) it indicates that Mrs. Lichtenstein has three dependents, when she only had two (her husband had three). Pl.'s Exs. 1, 29. Mr. Murray testified that cross references are not unusual when there is a familial tie between clients. It is also noteworthy that Pl.'s Ex. 1 was dated April 2, 1985, six days before Mrs. Lichtenstein met with Mr. Chewning to open her account. Mrs. Lichtenstein never saw this document until the inception of this litigation.

■ What is known in the securities brokerage business as the "know your customer rule" requires that a registered representative have knowledge of a client's objectives, needs and circumstances, or must be prepared to say that the client refused to say what those preferences are. Kidder Peabody agreed in its Premium Account Agreement with Mrs. Lichtenstein that it would maintain all accounts pursuant to the rules and regulations of the New York Stock Exchange. Pl.'s Ex. 3. Under these rules, a brokerage house must:

> Use due diligence to learn the essential facts relative to every customer, every order, every cash or margin account accepted or carried by such organization and every person holding power of attorney over any account accepted or carried by such organization.

> Supervise diligently all accounts handled by registered representatives of the organization.

> [Not] exercise any discretionary power in any customer's account or accept orders for an account from a person other than the customer without first obtaining written authorization from the customer.

Rule 405(1), (2) and Rule 408. See Pl.'s Ex. 33. The section on plaintiff's New Account Request Form, which was set aside for this purpose was signed by Mr. Chewning's secretary. Pl.'s Ex. 1 section 22A. Mr. Murray testified that it is appropriate for a secretary

of a registered representative at Kidder Peabody to sign the New Account Request Form, and that he would have approved such a form.

The Kidder Peabody Client Information form for Mrs. Lichtenstein's account (Pl.'s Ex. 2) also has some questionable omissions, including the date, type of account, phone numbers, account source, and amount of funds in the account. It was signed by Mr. Chewning's secretary rather than by Mr. Chewning, as is normally required, in order to verify its accuracy and the financial soundness of opening the new account.

## B. MONTHLY STATEMENTS

The Lichtensteins originally formed a company named Fashion II, in the East Liberty section of Pittsburgh. At some point Mrs. Lichtenstein transferred her ownership interest in Fashion II to her husband, but worked there occasionally as a buyer and retail sales assistant.

On her application form for the Premium Account, Mrs. Lichtenstein requested that the monthly statements be sent to the Fashion II address, at 6111 Penn Avenue, Pittsburgh. She testified that she did this at the suggestion of her husband and Mr. Chewning. The monthly statements included information on securities transactions in the Premium Account.

The agreements which Mrs. Lichtenstein signed stated that: "I understand that I should carefully review the monthly statements promptly after receipt and notify KP [sic] of any errors" (P.'s Ex. 3); "all communications ... sent, whether by mail, telegraph, messenger or otherwise, shall be deemed given to me personally, whether actually received or not." (P.'s Ex. 4).

Mrs. Lichtenstein testified that she only saw the first two or three monthly statements, which she could not comprehend at the time and certainly did not understand while on the witness stand at trial. When she read the portion of the monthly statement printout entitled "line of credit," she assumed that this was the interest available for check writing purposes and that the principle was left untouched, per her instructions,

as a "safety net" for her family. She could not have been further from the truth.

After glancing over the first few statements, she let her husband receive them in the mail at Fashion II. She never looked at one again. She trusted that her husband was keeping track of the progress of her investments. She admitted that if she had she read the "Checking Statement Activity" portion of the monthly statement, Def.'s Ex. F, she would have been able to tell to whom the checks were written and for what amounts. But she testified that she had no reason to look at the statement because Mr. Lichtenstein had her unwavering trust. We accept this statement as true.

## C. FORGED CHECKS AND OTHER TINKERING

Mrs. Lichtenstein wrote a handful of checks while she had the check book in her possession, early in the history of her account. After a few weeks or so, just as she had done with her monthly statements, she handed over the blank checks and checking account ledger to her husband, because she "did not want to be tempted" to spend any money. Thereafter, if she needed to write a check on the account, she asked her husband for a blank check. She expected that she could spend roughly $13,000 per year while maintaining the principal balance, although she admits that in the first five months of her account she wrote checks in excess of $50,-000. She assumed that Kidder Peabody would notify her if she exceeded the available credit limit, i.e. above and beyond the principle.

Indeed, some checks debited to her account were legitimately signed by Mrs. Lichtenstein. Pl.'s Ex. 8. These checks were numbered 102, 103, 104, 106, 109, 113 and 124. She didn't notice or question the sequential gap in the check numbers. She testified that some of these legitimate checks were written for household and personal purposes and a total of $50,800 worth were payable to Fashion II. Fashion II had been having cash flow problems, and Mrs. Lichtenstein considered these payments as loans to the business—and, as such, expected that she would be reimbursed with interest

once Fashion II got back on its feet. The store, after all, was a family business and she had an interest in keeping it profitable for the livelihood of her family.

Mrs. Lichtenstein admitted that she wrote and signed check number 124 dated August 15, 1985 and made payable to Fashion II, even though the imprinted check number had been crossed out and the number "107" was written in her husband's handwriting before she signed the check. When she questioned the numbering, her husband said that he had to void the original check numbered 107 and that he had just pulled out a check from the back of the checking booklet to replace it. Still, she didn't question this incident, nor did she ask to see the checkbook or statement for her account. In reality, check number 107 was one of the checks which had been forged by her husband in the amount of $5,000.

There were also two checks numbered 113. She was not aware of a duplicate checkbook with the same numbers, and she never noticed that two separate checks had been written using one number.

The majority of checks written against her Premium Account, however, were forged by Mr. Lichtenstein without Mrs. Lichtenstein's knowledge or authorization. Pl.'s Ex. 9. Mr. Lichtenstein admitted to this while on the witness stand. His testimony was credible.

### D. OTHER EVIDENCE THAT CHEWNING AND KIDDER PEABODY KNEW

Mr. Lichtenstein had frequent contact with Mr. Chewning regarding plaintiff's account. Mr. Lichtenstein testified that he talked to Mr. Chewning regularly because he was trading regularly within his own Kidder Peabody account. Mr. Lichtenstein knew that from 1986 through 1987 plaintiff's account funds were quite low, but he never told her.

The parties disagree as to the extent of Mr. Chewning's, and thus, Kidder Peabody's, knowledge of the forgeries. We find that Mr. Chewning knew about the forgeries and helped Mr. Lichtenstein hide his misdeeds. Mr. Lichtenstein credibly testified that at

one point, he asked Mr. Chewning whether or not anyone at Kidder Peabody or any bank would notice if he signed his wife's signature on her Premium Account checks, and Mr. Chewning responded that nobody would notice it. Mr. Chewning denied that this conversation ever took place, but we did not find his testimony credible.

Over a hundred checks were thereafter forged. Pl.'s Ex. 9-1 through 9-104. These checks were routed through the federal reserve system to Bank One, which made payment on the checks. Kidder Peabody was to verify the signatures. Pl.'s Ex. 24. Kidder Peabody's policy mandates that only those checks written in amounts over $50,000 are verified. Verification is accomplished by comparing the signature on the check to the signature on the client information form. Pl.'s Ex. 2.

A series of short handwritten notes from Mr. Lichtenstein to Mr. Chewning further support our finding that Mr. Chewning realized that Mr. Lichtenstein was up to no good. Pl.'s Ex. 14, 18, 19 and 21. Mr. Lichtenstein testified, and these notes corroborate his testimony, that he was having Chewning hold certain checks and writing other checks to cover shortfalls which arose from legitimate checks written by Mrs. Lichtenstein. Plaintiff's Exhibit 14 is a memorandum written on May 2, 1986 which states, "Enclosed are 3 checks for Jodie's account—okay to use Mon. Tues & Weds. At this point according to my records you shouldn't be holding any of the old checks—Please advise if I'm wrong." These checks were deposited, each in the amount of $1,000, into plaintiff's account on May 5, 7 and 8, 1986, precisely as Mr. Lichtenstein had instructed. Ex. F-2. We note that this implies that such a scheme had been undertaken by these gentlemen on previous occasions.

On December 7, 1986 Mr. Lichtenstein sent another memorandum which states, "Jodie deposited check from her K-P account on Friday—*Enclosed is a check to cover.* If there is any way possible—Please delay using until Wednesday. If no choice then use on Tuesday...." (emphasis added). This latter note obviously implies that Mr. Lichtenstein was giving a check to Mr. Chewn-

ing to cover an overdraw by Mrs. Lichtenstein so that she would not know of his use of her Premium Account funds. Mrs. Lichtenstein was never told about this cover-up by anyone at Kidder Peabody. Mr. Lichtenstein testified that Mrs. Lichtenstein had asked him for a check and thus he had "rushed over" another check to Mr. Chewning to cover his tracks. Mr. Chewning held Mr. Lichtenstein's check and later deposited it on December 9, 1986 into plaintiff's account. Ex. F–2. He therefore covered Mr. Lichtenstein's tracks as well.

Plaintiff's Exhibit 19 is a memorandum dated March 7, 1987 in which Mr. Lichtenstein writes to Mr. Chewning, "[e]nclosed is a check in amount of $4,700 for Jodie's account. I hope its possible to delay its useage [sic] until Tuesday—at least...." This check was deposited on March 12, 1987. Ex. F–2. It bounced. Soon thereafter, on March 16, 1987, Boyd Murray acting in his capacity as assistant branch manager at that time, executed a Returned Checks Memo for a check in the amount of $4,700 for insufficient funds and requested certification or cashier's check. Pl.'s Ex. 21. The check was returned. Mr. Lichtenstein wrote a memorandum on that same day which states, "As per phone call from your office—I am to bank for certified funds—*I goofed* and certified $3,700 instead of $4,700—Therefore enclosed is check in amount of $1,000...." Pl.'s Ex. 22. (emphasis added).

We believe, based on the evidence and testimony presented at trial, that someone at Kidder Peabody, most likely Mr. Chewning, contacted Mr. Lichtenstein regarding the checks that were being issued from the plaintiff's account with insufficient funds. This also lends support to our finding that Kidder Peabody treated Mrs. Lichtenstein's account as if it were her husband's.

A number of checks written on Mrs. Lichtenstein's account were returned for insufficient funds. Pl.'s Exs. 17, 21. On December 4, 1986, the late Thomas C. Ryan, Sr., branch manager of the Pittsburgh office during the relevant time period, signed a Returned Checks Memo which indicated that a check for $150 that had been deposited into Mrs. Lichtenstein's account should be returned for insufficient funds. Pl.'s Ex. 17. As discussed previously in this opinion, Boyd Murray signed the debit invoice which required that an official bank check replace a bad check in the amount of $4,700. The following checks were also declined for insufficient funds, with immediate deposits of local checks or transfers from the joint account made soon thereafter: 116, 164, 188—193, 210, 217, 225—27, 232, 234, 235, 238 and 241. Ex. F–2.

Kidder Peabody's present Pittsburgh Branch Manager, Mr. Murray, testified as to the manner in which Premium Accounts are routinely managed and watched. He explained that a supervising manager performs oversight, but no direct supervision, on an account by account bases. Supervisors respond to customer complaints and identify when an account has too much activity or speculation in the securities market. They do not directly supervise the check writing aspect of a customer's account. Supervisors review monthly statements sent to customers and ensure that there is an adequate margin of securities (as Kidder Peabody collateral) to cover any cash flow problems in a particular account.

Mr. Chewning likewise testified that broker/dealers do not have the responsibility to monitor any customer's checking account. In the event of a customer overdraft on an account, Bank One would hold onto the check, blocking the customer's account whereby Bank One will not honor any check writing transactions until the overdraft has been corrected. Kidder Peabody's internal cashiering is handled in the New York data processing section of its Premium Account Operating Center. A billing clerk in New York provides a list of all clients whose account balances have fallen below $10,000, and which would therefore incur monthly charges, and also those with balances below a $5,000, which entail still greater monthly charges. Kidder Peabody may terminate a Premium Account if it falls below $5,000 balance as a result of withdrawals. Ex. 24. Insufficient funds returns triggered a $12 charge per check against plaintiff's account. Mrs. Lichtenstein also incurred a minimum monthly maintenance charge of $10 from Au-

gust 1986 until July 1987 for failure to keep her balance over $5,000. Each of these charges appeared on her monthly statements.

Whenever a balance falls below this level, a report is sent to the branch office from the New York Operating Center setting forth the account number and the minimum amount in the account. The report also requests a decision from the branch office whether to terminate the account. It is Kidder Peabody policy to notify clients that their accounts have fallen below these levels. Pl.'s Ex. 31 (Kidder Peabody's Operations Center Operations Manual). The branch office's registered representative must contact the customer.

Boyd Murray had not seen any report of this type regarding plaintiff's account. Kidder Peabody is not even sure if this was done in the case of Mrs. Lichtenstein. Mr. Chewning was not advised to do so by anyone at Kidder Peabody. Mrs. Lichtenstein's account constantly fell below these levels, and indeed, repeatedly indicated deficit levels. For example, between August 30, 1985 and June 30, 1986, her debits fell to $249,000 and her credits totalled $42,070. Pl.'s Ex. 35, "Money In and Out Transactions." Plaintiff's average monthly account value was below this minimum each month from May 30, 1986 until August 27, 1987 except for the months of July 1986, October 1986, and May 1987. Her minimum aggregate qualifying value (or net portfolio equity) dropped below $5,000 for eighteen monthly periods. Ex. F–2. From November 1, 1985 until November 29, 1985, her ending net portfolio equity was minus $97,680.46. Ex. F–2.

Twenty three checks were issued without sufficient funds. Mr. Chewning testified that whenever a check was issued from an account without sufficient funds, his practice was to telephone his customers. Boyd Murray explained that, based on his experience at Kidder Peabody, he was sure Mr. Lichtenstein was notified about all checks issued from plaintiff's account without sufficient funds. Kidder Peabody sends the registered representatives the monthly statements of their customers.

Rule 405(2) of the New York Stock Exchange requires that brokerage firms "supervise diligently all accounts handled by registered representatives of the organization." Despite this requirement, Mr. Chewning only reviewed Mrs. Lichtenstein's account once or twice because he didn't think it was his responsibility to do so.

### E. STOCK ACTIVITY

In addition to the allegations regarding her checking account, plaintiff charges that her endorsement was forged to authorize the sale and transfer of certain securities which were held in her premium account. Complaint ¶¶ 19–28. She also alleges that Kidder Peabody guaranteed the signatures as being hers. Complaint ¶ 21. The New Account Request Form indicated that there would not be any trading authority connected with this account. Pl.'s Ex. 1.

During the usage of her Premium Account, which began in early April 1985 and ended in August of 1987, Mrs. Lichtenstein instructed Kidder Peabody to purchase stock only once. On the advice of one of her cousins, she purchased stock in Sun Energy Limited Partners in late 1985. She contacted Mr. Chewning regarding this purchase.

Incidentally, when she met with him to discuss this purchase in December 1985, unknown to her, the balance of her account had been negative $132,487.87 a week earlier. He never told her of this negative balance. She trusted that Chewning would make the proper investments and was never phoned or notified by any Kidder Peabody employee between the date of the opening of the account and the date on which she discovered her husband's misdeeds, July 24, 1987.

Kidder Peabody only prepares a list of securities transactions upon receiving a request from the customer. Def.'s Ex. O.

Plaintiff also charges that bonds in which she had an ownership interest were redeemed over her forged indorsement. Complaint at ¶¶ 30, 37. Mrs. Lichtenstein's parents had purchased some shares in the Vanguard Windsor Fund for her when she was a young girl. She had never touched these securities, and their dividends were reinvest-

ed automatically. Mr. Lichtenstein admitted that he signed over these funds into her account in two separate transactions without her knowledge or authorization, but with a Kidder Peabody signature guarantee. Pl.'s Ex. 10, 11, and 12. A note written to Mr. Chewning, Pl.'s Ex. 12, forged by Mr. Lichtenstein, states that Mrs. Lichtenstein wanted the second batch of Windsor Fund stocks transferred into her Premium Account. Both Lichtensteins testified that Mr. Lichtenstein had forged this note. A Kidder Peabody signature guarantee is stamped on this document.

Other securities transactions occurred without Mrs. Lichtenstein's knowledge or approval. First, on November 25, 1985 Allegheny County Hospital Development Authority for McGee Women's Hospital Bonds were purchased for her account. These bonds were then sold on May 3, 1986 which netted roughly $1,400 profit. Second, her 1500 shares of Sun Energy Partners stock, which had previously been purchased per her request, was sold at a loss of $6,700 on April 25, 1986 without her consent. Third, some 55,000 shares of Putnam stock was sold without yielding a profit on March 31, 1986 without her knowledge.

Each of these transfers occurred with the help of a Kidder Peabody signature guarantee and were reported in her monthly statement, Mrs. Lichtenstein was completely unaware of all of them until she confronted her husband in July of 1987.

Mrs. Lichtenstein contends that had a proper signature guarantee policy been enforced, her ex-husband's forgeries of her checks and stock transfers would never have happened. Kidder Peabody does not have specific requirements or conditions for an employee to guarantee a signature, nor is it necessary for the employee to see the person face to face. *See* Janet Nola Dep. Feb. 15, 1991, p. 6. To ensure authenticity, Kidder Peabody relies on the broker/registered representative's representation, and most customers signatures are automatically guaranteed. Nola Dep. at 6, 7. Mr. William M. DiLodovico, Vice President and Branch Operations Manager at Kidder Peabody, testified that such verification policy is in accor-

dance with commercial standards. Mr. DiLodovico is a non-expert whose experience is limited to Kidder Peabody. Boyd Murray also testified that the defendant's signature guarantee policy conformed to reasonable standards.

Mrs. Lichtenstein first learned of the problems with her account on July 24, 1987, when she and her parents confronted Mr. Lichtenstein about his forgeries, and he admitted that all the money which she had invested at Kidder Peabody was gone. She argues that up to that point, Kidder Peabody had not notified her of any problems with her account. Each transition was reflected in her monthly statement.

Obviously, at this point, Mrs. Lichtenstein no longer trusted her husband; she divorced him. She has since been employed as a medical assistant in order to support her children.

Mr. Chewning terminated his employment at Kidder Peabody on November 5, 1987 because his former employer, Paine Webber, offered him more attractive employment terms. Kidder Peabody's investigation into Mr. Chewning's handling of Mrs. Lichtenstein's account concluded that Mr. Chewning acted appropriately.

Mr. Chewning testified that he received no Kidder Peabody training and was aware of no operations or procedural manuals.

## II. CONCLUSIONS OF LAW

Mrs. Lichtenstein charges defendant Kidder Peabody with conversion as to the Windsor Fund shares (Count I), constructive fraud (Count II), negligence (Count III), breach of express and implied contract (Count IV), and breach of fiduciary duty (Count V).

### A. BREACH OF CONTRACT

■ Articles Three and Four of the Pennsylvania Commercial Code (hereinafter "the Code") govern the duties and liabilities of the parties in cases involving bank deposits and collections. 13 Pa.C.S.A. §§ 3101—3805, 4101—4504 (1980). Payment on a forged drawer's signature violates the duty of the bank to charge its customers' accounts for only properly payable items. *Hardex–Steu-*

*benville Corp. v. Western Pennsylvania Nat. Bank,* 446 Pa. 446, 285 A.2d 874, 876 (1971). "[U]nder the Code a bank breaches its agreement with a customer when it pays the holder of a forged check. It is this breach which constitutes the customer's cause of action against a bank to recover the sums paid out on checks bearing forged signatures." *Id.* "[A] bank's duty to its customer rests upon an implied contract to honor a depositor's checks which bear genuine signatures. Hence, in honoring a forged check the bank is deemed to have used its own money not the depositor's, and is liable on the contract of deposit to recredit the customer's account." *Cumis Ins. Soc., Inc. v. Girard Bank,* 522 F.Supp. 414, 418 (1981).

The relevant Code provisions read as follows:

§ 4406. *Duty of customer to discover and report unauthorized signature or alteration.*

(a) *General rule.* When a bank sends to its customer a statement of accounting accompanied by items paid in good faith in support of the debit entries or holds the statement and items pursuant to a request or instructions of its customer or otherwise in a reasonable manner makes the statement and items available to the customer, the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an item and must notify the bank promptly after discovery thereof.

(b) *Effect of failure to report unauthorized signature or alteration.* If the bank establishes that the customer failed with respect to an item to comply with the duties imposed on the customer by subsection (a) the customer is precluded from asserting against the bank:

(1) his unauthorized signature or any alteration on the item if the bank also establishes that it suffered a loss by reason of such failure; and

(2) an unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank after the first item and statement was available to the customer for a reasonable period not exceeding 14 calendar days and before the bank receives notification from the customer of any such unauthorized signature or alteration.

(c) *Nonliability of bank affected by lack of ordinary care* The preclusion under subsection (b) does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the item.

(d) *Statute of limitations applicable to customer.* Without regard to care or lack of care of either the customer or the bank a customer who does not within one year from the time the statement and items are made available to the customer (subsection (a)) discover and report his unauthorized signature or any alteration on the face or back of the item or does not within three years from that time discover and report any unauthorized endorsements is precluded from asserting against the bank such unauthorized signature or endorsement or such alteration.

\*      \*      \*      \*      \*      \*

§ 3406. *Negligence contributing to alteration or unauthorized signature.*

Any person who by his negligence substantially contributes ... to the making of an unauthorized signature is precluded from asserting the ... lack of authority against ... a drawee or other payor who pays the instrument in good faith and in accordance with reasonable commercial standards of the business of the drawee or payor.

13 Pa.Cons.Stat.Ann. §§ 3406, 4406 (1982).

Sections 3406 and 4406 do not operate to discharge the bank from liability if the bank itself fails to exercise ordinary care in paying the item. *Hardex–Steubenville,* 285 A.2d at 877. The bank's duty of ordinary care is implicit in the contractual relationship, and the thus, under the Code, is primarily liable when it pays out on a forged drawer's signature because "it is charged with the absolute duty of knowing and recognizing the signatures of its drawer-depositor." *Cumis Ins. Soc.,* 522 F.Supp. at 420, n. 17, *citing West Penn. Admin., Inc. v. Union Nat'l Bank of Pittsburgh.,* 233 Pa.Super. 311, 335 A.2d 725, 735 (1975).

On December 28, 1989, we granted Kidder Peabody's motion for partial summary judgment on the ground that the Pennsylvania one-year statute of limitations precludes plaintiff's assertion of liability for many of the unauthorized checks. 13 Pa.Cons.Stat. § 4406(d) (1982); *Lichtenstein v. Kidder, Peabody & Co., Inc.,* 727 F.Supp. 975 (W.D.Pa.1989). We held that for the purposes of the Code, Kidder Peabody is a "bank" and that Kidder Peabody "made available" Mrs. Lichtenstein's checks and statement within the meaning of § 4406. *Id.* at 980.

We later rescinded this Order as to the statute of limitations issue due to newly discovered evidence which demonstrated that there was a genuine issue as to whether Kidder Peabody knew of the alleged forgeries before August of 1987 and that its behavior constituted constructive fraud. *Lichtenstein v. Kidder, Peabody & Co., Inc.,* 777 F.Supp. 423 (W.D.Pa.1991). This evidence included the three notes written by Mr. Lichtenstein to Mr. Chewning in order "to cover" his tracks and Mr. Lichtenstein's deposition testimony that Mr. Chewning had told him that nobody would notice the forgeries. We also held that "a bank which has engaged in fraudulent conduct should not be afforded the protection" of a statute of limitations defense. *Id.* at 426. Plaintiff was therefore permitted to amend her complaint to include allegations of constructive fraud in the payment of the checks. *Id.* at 427. We explained that in order to circumvent the protection afforded the defendant by section 4406(4) of the Code, plaintiff must prove that Kidder Peabody engaged in fraudulent conduct, which, as a matter of law, is bad faith. *Id.*

■ Constructive fraud arises upon a showing that there has been a (1) breach of a duty; (2) which tends to deceive others; and (3) operates to their injury, even though there is no vicious intent. *Charleroi Lumber Co. v. Bentleyville Borough School District,* 334 Pa. 424, 6 A.2d 88, 91 (1939). We have previously held that "[b]ecause intent is not an element of constructive fraud, a party whose actions constitute constructive fraud might still have acted in good faith. Good faith is defined by the Uniform Commercial Code as honesty in fact in the conduct or transaction concerned." *Lichtenstein,* 777 F.Supp. at 427. Defendants argue that there has not been a showing of "bad faith" or dishonesty and therefore, under our November 14, 1991 Opinion, plaintiff is not entitled to recover on a constructive fraud basis.

Plaintiff argues that in addition to the implied contract breach, Kidder Peabody failed to meet its *express* contractual obligations as provided in the Kidder Peabody Premium Account Agreement, Pl.'s Ex. 3. This agreement provides that plaintiff's account will be maintained in accordance with the rules and regulations of the New York Stock Exchange and Kidder Peabody policy. It is questionable whether these Exchange rules create a separate cause of action, but they are instructive as to the ordinary care standard regarding the securities transactions.

As discussed above, the Rules of the New York Stock Exchange provide that a brokerage house must "[u]se due diligence to learn the essential facts relative to every customer ... every margin account ... Supervise diligently all accounts handled by registered representatives ... [and not] exercise any discretionary power in any customer's account or accept orders for an account from a [non-customer] without first obtaining written authorization of the customer." Rules 405(1) and (2); Rule 408(a).

Mrs. Lichtenstein argues that Kidder Peabody breached its contract by failing to supervise her account diligently, if it supervised the account at all. The evidence at trial supports this contention. Chewning failed to contact the plaintiff during the lifetime of her account regarding her low account balance, returned checks, the monthly maintenance charges, and the stock transactions. Instead, he focused his attention on Mr. Lichtenstein, who did not have authority to act on Mrs. Lichtenstein's behalf, a fact which Mr. Chewning overlooked and even encouraged by permitting the authorizations which were contrary to Mrs. Lichtenstein's wishes. Mr. Chewning held and deposited checks on behalf of Mr. Lichtenstein without Mrs. Lichtenstein's approval. He also failed to noti-

fy her when her investment objective—to preserve the principal balance—could no longer be met due to lack of funds. Instead Chewning contacted Mr. Lichtenstein when the funds were insufficient to cover returned checks. Kidder Peabody never reviewed her monthly statements or checking activity in the checkwriting feature.

■ We have no doubt that Mr. Chewning was aware of Mrs. Lichtenstein's objectives and the fact that the forgeries were occurring. We hold that plaintiff has met her burden of proof regarding constructive fraud and breach of contract as there is clear evidence Mr. Chewning helped to deceive Mrs. Lichtenstein. His behavior also exhibited bad faith. Kidder Peabody was obligated to honor Mrs. Lichtenstein's request that nobody be authorized to act on her behalf regarding her account. Kidder Peabody failed to verify the signatures on checks drawn from plaintiff's account. Additionally, Kidder Peabody failed to glean the essential facts about Mrs. Lichtenstein when the account was opened or even when the securities transactions occurred.

Kidder Peabody policy mandates that customers be advised of the vulnerability to fraud when offered the Visa checkwriting feature and to take prophylactic steps to reduce the chance of fraud. Pl's Ex. 24, Vol. VI, Part A § 15. Additionally, Kidder Peabody must notify a customer and the customer representative in the event the account balance falls below the minimum aggregate balance of $5,000. *Id.* at § 1; Pl.'s Ex. 31. Kidder Peabody policy also directs that a customer must be notified when a check without sufficient funds is issued from that customer's account. Finally, Kidder Peabody requires that a customer must authorize any transactions in a nondiscretionary account.

Kidder Peabody should have trained or advised Mr. Chewning regarding the susceptibility to fraud in checkwriting, although it is · hard to imagine that a person with his experience would not already have been well aware of this. Kidder Peabody should have also inquired into plaintiff's account further when its own records clearly indicated that the account balance was far below the client's

objectives and at a level where the termination of the account should be discussed. Additionally, Kidder Peabody violated its own policies when it failed to notify the plaintiff, about did notify her husband, about the checks issued with insufficient funds. Finally, Kidder Peabody clearly violated its agreement with Mrs. Lichtenstein when it effectuated securities transactions without her authorization.

## B. NEGLIGENCE

■ It is well-settled law that the elements of negligence are: (1) a duty or obligation recognized by law, requiring the actor to conform to a certain standard of conduct; (2) failure to use reasonable care under the circumstances; (3) causation; and (4) actual loss or damage. *Alumni Ass'n v. Sullivan,* 369 Pa.Super. 596, 535 A.2d 1095, 1098 (1987), *aff'd,* 524 Pa. 356, 572 A.2d 1209 (1990); *Morena v. South Hills Health System,* 501 Pa. 634, 462 A.2d 680, 684 (1983). Bad faith is typically defined as subjectively dishonest behavior, beyond negligence. *Hartford Accident & Indem. v. First Pennsylvania Bank,* 859 F.2d 295, 297 (3d Cir. 1988); *Davis v. Pennsylvania Co. for Ins. on Lives, Etc.,* 337 Pa. 456, 12 A.2d 66 (1940).

[8] Plaintiff's negligence claim arises out of allegations that Kidder Peabody's duty to her arose by contractual obligations and as a result of its brokerage relationship. *Alfara v. E.F. Hutton & Co., Inc.,* 606 F.Supp. 1100 (E.D.Pa.1987). She argues that in accepting her as a customer, Kidder Peabody breached its duty to inform itself about her objectives and how those objectives could be met. The plaintiff explains that Kidder Peabody's negligence arose in that it: (1) failed to set forth accurate information in the New Account Request Form; (2) negligently told third-party defendant Mr. Lichtenstein that the forgeries would go unnoticed regardless of who was authorized to transact within her account; (3) accepting orders for her account without her authorization to do so; (4) allowed its registered representative to be unfamiliar with the product features such as interest rates and check writing v. Visa card options; (5) failed to adequately train its representatives regarding the vulnerability

to fraud of plaintiff's account; (6) failed to warn plaintiff about that vulnerability to fraud; (7) failed to notify her when she incurred interest charges as a result of her debit balances; and (8) failed to determine whether the endorsement on the Windsor Certificate (Pl.'s Ex. 10) or the signatures on the Stock Power (Pl.'s Ex. 11) were the endorsement signatures of the plaintiff.

The plaintiff has met her burden in the non-statutory negligence allegations because the evidence at trial clearly shows that Kidder Peabody management believed that Mr. Chewning was responsible for the monitoring of plaintiff's account, while at the same time, Mr. Chewning did not believe it was his responsibility. Obviously, Mr. Lichtenstein bears most of the blame on the negligence issue, however, we believe that Kidder Peabody cannot avoid liability where its conduct was not consistent with reasonable care under the foreseeable circumstances. Check-writing fraud is not a new phenomenon, and neither is deception on the part of one spouse against another. Nor can Kidder Peabody ignore the fact that its opening of the account in the first place was shoddy, and that the plaintiff clearly did not understand the mechanics of an account of this size.

Kidder Peabody was clearly in the best position to determine whether Mrs. Lichtenstein's investment objectives were being met, given the frequent returned checks and insufficient fund problems. Someone at Kidder Peabody should have discovered, using reasonable business acumen, that the account balance was dangerously low, and low it was, for months! The monitoring of the account was sadly lacking, given the blatant foreshadowing, or hints, if you will, of what was going on. Mr. Lichtenstein's notes to Mr. Chewning and accompanying deposits "to cover" the legitimate withdrawals speak for themselves. Mr. Chewning must have known that Mrs. Lichtenstein was a victim of her husband's machinations, and in fact, *aided* Mr. Lichtenstein in the forgery scheme. Instead of contacting her, they contacted her husband, *whose name was not on the account.* They owed a separate and distinct duty to Mrs. Lichtenstein, which they breached.

As for negligence in the handling of the stock purchases and sales, Kidder Peabody was negligent in its guaranteeing of the authenticity of the signature on those stock powers and on a message, forged by Mr. Lichtenstein, requesting transfer of some Windsor Fund shares. Pl.'s Ex. 12. As a result, the shares were transferred against Mrs. Lichtenstein's wishes.

The Code imposes a duty on the bank customer to discover and report an unauthorized signature or alteration after the occurrence of a forgery. 13 Pa.Cons.Stat. § 4406(b) (1982). Kidder Peabody argues under this statute, plaintiff's failure to notify it of the forgery at least 14 days after the first forged item was made available to her precludes the claim against it on checks paid in good faith. However, since Kidder Peabody failed to exercise ordinary care in paying the checks, it may be held liable regardless of whether plaintiff failed to notify the bank in a timely fashion. Pa.Cons.Stat. § 4406(c)(1984).

Kidder Peabody alleges that Mrs. Lichtenstein has failed to prove bad faith and asserts that even if she has shown negligence, her claim is barred because she was contributorily negligent, as provided in the Code. 13 Pa.Cons.Stat.Ann. § 3406 (1984). This section of the Code applies to the maker's conduct prior to the forgery, and precludes one who 'substantially contributes' to an alteration or the making of a forged signature from asserting a claim arising from such an alteration or signature against other parties. *Hardex–Steubenville Corp. v. Western Pennsylvania Nat'l Bank,* 446 Pa. 446, 285 A.2d 874, 879 (1971). "Conduct 'substantially contributes' to a material alteration or forged signature if it is a contributing cause *of the alteration or signature* and a substantial factor in bringing it about." J.J. White & Robert S. Summers, Uniform Commercial Code, Negotiable Instruments and Funds Transfers Revised Articles 3 and 4 and Article 4A, 3d Ed., Vol. 1B, p. 70 (1991) (emphasis added).

The credible evidence produced at trial does not support a finding that Mrs. Lichtenstein is precluded from recovery by application of section 3406 of the Code. A

bank may shift liability on the drawer by proving that her negligent conduct caused the forgery loss. "But the Code views the bank's duty to use ordinary care in paying out an instrument as paramount, and excuses drawer negligence when the bank is also at fault." *Cumis Ins.*, 522 F.Supp. at 420, n. 17. While Mrs. Lichtenstein's conduct was perhaps irresponsible, it was not negligent because she was entitled to hold a reasonable, good faith belief that her husband, or Kidder Peabody through Mr. Chewning, would contact her about account irregularities and that her clear mandate to the defendant to preserve the principal would be carried out by what she believed was a trustworthy brokerage firm. Even if her conduct rises to the level of negligence, Kidder Peabody has failed to prove that her alleged negligence substantially contributed to the unauthorized transactions. Kidder Peabody hypothesizes that if Mrs. Lichtenstein had not handed over the checking ledger and monthly statements to her husband, his forgeries would not have happened. This speculation does not meet the defendant's burden of proof.

### C. CONVERSION

■ Mrs. Lichtenstein alleges that the defendants should be held liable for conversion of her Windsor Fund Shares. Amended Complaint Count I. Conversion is (1) the deprivation of another's right in or use or possession of (2) chattel (3) without the owner's consent and (4) without legal justification. *Welded Tube Co. of America v. Phoenix Steel Corp.*, 512 F.2d 342, 345 (3d Cir. 1975).

■ Defendant posits that plaintiff was never deprived of the use or possession of her Windsor Fund shares because the monies from the redemption were deposited into her Premium Account. Moreover, Kidder Peabody argues that Section 8–312 of the Code forbids plaintiff to rely on the signature guarantees to prove her conversion theory. 13 Pa.Cons.Stat.Ann. § 8312(c); *see Love v. Pennsylvania R.R. Co.*, 200 F.Supp. 561, 563 (E.D.Pa.1961). The Code provides as follows:

§ 8–312. *Effect of Guaranteeing Signature or Indorsement.*

(a) *Warranties of signature guarantor.* Any person guaranteeing a signature of an indorser of a security warrants that at the time of signing:

(1) the signature was genuine;

(2) the signer was an appropriate person to indorse; and

(3) the signer had legal capacity to sign.

But the guarantor does not otherwise warrant the rightfulness of the particular transfer.

\* \* \* \* \* \*

(3) *Persons protected by warranties.* The foregoing warranties are made to *any person taking or dealing with the security in reliance on the guarantee* and the guarantor is liable to such person for any loss resulting from breach of the warranties.

13 Pa.Cons.Stat.Ann. § 8312(a), (c) (1982) (emphasis added). Defendant argues that since plaintiff did not take or deal with the security in reliance on the guaranteed signature, Kidder Peabody's warranty did not extend to her, and therefore it is not liable to her for any loss resulting from its breach. It has been so held. *Love*, 200 F.Supp. at 562—563. "[A] person making a general guarantee or warranty is liable only to those parties who have acted in reliance thereon." *Id.* at 563. In this regard, we agree with the defendant as to the conversion allegation. The plaintiff has already proven negligence.

### D. BREACH OF FIDUCIARY DUTY

■ A broker has a fiduciary obligation to his client as an agent to a principal. *Merrill Lynch v. Perelle*, 356 Pa.Super. 165, 514 A.2d 552, 560 (1986). "Unless otherwise agreed, an agent is subject to a duty to use reasonable effort to give his principal information which is relevant to his affairs entrusted to him and which ... the principal would desire to have." Restatement (Second) of Agency § 381. Kidder Peabody maintains that it met its fiduciary duty by sending monthly statements to the plaintiff with all relevant information included. It also argues that plaintiff has not established that Kidder Peabody had a duty to monitor her checking account activity in a fashion other than what was done.

We find these arguments unpersuasive. Mrs. Lichtenstein clearly should have been told of the stock sales because she had expressed her intent to maintain a principal balance; she should have been notified of her husband's deposits to cover the forgeries as well.

### E. STATUTE OF LIMITATIONS DEFENSE OUTSIDE THE CODE

■ Defendant argues that all of plaintiff's tort claims are barred by the applicable Pennsylvania statutes of limitations. First, as to plaintiff's conversion allegation, actions "for taking, detaining or injuring personal property, including actions for specific recovery thereof" must be filed within two years. 42 Pa.Cons.Stat.Ann. § 5524(3) (1982). Defendant argues that the Windsor Fund shares were redeemed in September 1986, over two years before plaintiff commenced suit, and accordingly, that judgment for defendant should be entered regarding Count I of the Amended Complaint.

Second, actions "to recover damages for injury to ... property which is founded upon negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, including deceit or fraud" must be commenced within two years. 42 Pa.Cons.Stat.Ann. § 5524(7) (1982). Defendant argues that the accrual dates of the tort claims were (1) the date of the act or omission or breach of duty (for negligence and breach of fiduciary duty); and (2) the commission of the act (for fraud or constructive fraud). The running of the statute of limitations in Pennsylvania may be tolled if fraudulent concealment is proven by clear, precise and convincing evidence. *Bohus v. Beloff,* 950 F.2d 919, 935 (3d Cir.1991). "There must be an affirmative and independent act of concealment that would divert or mislead the plaintiff from discovering the injury." *Id.* Assurances which lull a victim into a false sense of security may constitute fraudulent concealment. *Id.*

Kidder Peabody argues that it did not conceal the unauthorized transactions and in fact, disclosed them by mailing plaintiff's monthly statements. Kidder Peabody contends that had plaintiff exercised reasonable diligence, she could have discovered this conduct "and put a stop to the subsequent 'forgeries' as early as July 1985." Def.'s Proposed Findings of Fact and Conclusions of Law at 33.

We find that the statute of limitations was tolled and that there is sufficient evidence that Mrs. Lichtenstein neither knew nor should have known about the forgeries until the July 1987 confrontation with her husband. The constructive fraud arose when Mr. Chewning, defendant's employee, made several deposits into plaintiff's account "to cover" Mr. Lichtenstein's forgeries and when Kidder Peabody ignored all the warning signs of an account being milked of its entire contents, month after month. Mrs. Lichtenstein was lulled into a sense of security by an employee who clearly considered his primary obligation to be to Mr. Lichtenstein.

### F. DAMAGES

■ Plaintiff seeks $344,827.22 in damages. $215,223.05 of this is the aggregate amount of funds of the plaintiff and the value of the securities that were deposited in her account ($278,801.10), minus the authorized withdrawals legitimately made by the plaintiff ($63,577.05). The plaintiff has also calculated interest totalling $129,604.17. Kidder Peabody does not take issue with the amount of damages claimed (subtracting the amount of authorized withdrawals from the total of cash and securities deposited by plaintiff in her account. Def.'s Proposed Findings of Fact at n. 59. Defendants do contest plaintiff's calculation of interest at a 6% rate compounded daily because the interest should begin to accrue of the date plaintiff notified Kidder Peabody of the forgeries and also because simple interest is more fair. Defendant admits that an award of interest in tort claims is discretionary, citing *Am. Enka Co. v. Wicaco Mach. Corp.,* 686 F.2d 1050, 1057 (3d Cir.1982). We will exercise our discretion and therefore agree with the plaintiff's interest computation.

■ Finally, Kidder Peabody asserts that Mr. Lichtenstein should bear the full impact of his actions and that he should fully indemnify Kidder Peabody. We agree and will

hold Mr. Lichtenstein vicariously liable to Kidder Peabody for the damages awarded to the plaintiff.

### ORDER

AND NOW, to-wit, this 17th day of December, 1993, it is hereby ORDERED, ADJUDGED and DECREED that judgment is entered in favor of the plaintiff, Jodie B. Lichtenstein, and against defendant Kidder, Peabody & Co., Inc. and third-party defendant, Alan L. Lichtenstein, who are held to be jointly and severally liable to the plaintiff in the amount of $344,827.22.

This case is hereby DISMISSED.